**Janis M. REIGEL, Plaintiff–Appellee,**

**and**

**Brent Reigel and Bradley Reigel, Plaintiffs–Appellees and Cross–Appellants,**

**v.**

**SAVASENIORCARE L.L.C., a Delaware limited liability company; SavaSenior-Care Administrative Services, L.L.C., a Delaware limited liability company; and SSC Thornton Operating Company, L.L.C., a Delaware limited liability company, d/b/a Alpine Living Center, Defendants–Appellants and Cross–Appellees.**

No. 10CA1665.

Colorado Court of Appeals, Div. V.

Dec. 8, 2011.

Rehearing Denied Jan. 26, 2012.

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2011.

Law Offices of J.M. Reinan, P.C., Jerome M. Reinan, Jordana Griff Gingrass, Denver, Colorado, for Plaintiff–Appellee and Plaintiffs–Appellees and Cross–Appellants.

Gordon & Rees LLP, Thomas B. Quinn, Mary Byrne Fletcher, Denver, Colorado; Proskauer Rose LLP, Malcolm J. Harkins, III, James F. Segroves, Washington, D.C., for Defendants–Appellants and Cross–Appellees.

Opinion by Judge J. JONES.

Dennis Reigel died shortly after being taken to a hospital emergency room from a nursing facility owned by defendant SSC Thornton Operating Company, L.L.C., doing business as Alpine Living Center (Alpine). Mr. Reigel's surviving spouse, Janis M. Reigel, and surviving sons, Brent Reigel and Bradley Reigel, sued Alpine; Alpine's parent company, SavaSeniorCare L.L.C. (SSC); SavaSeniorCare Administrative Services, L.L.C. (Administrative Services), which provided payroll and personnel services to Alpine; and others.

As of the date of trial, only the claims against Alpine, SSC, and Administrative Services for negligence and outrageous conduct remained. The court directed a verdict in defendants' favor on the sons' claims. The jury found in Ms. Reigel's favor on her negligence and outrageous conduct claims, awarding her a total of $450,000 in damages.[1]

---

1. The jury apportioned fault amongst Alpine, SSC, and Administrative Services in varying percentages. The court also reduced the damages award to the extent the punitive damages awarded exceeded the actual damages awarded.

Defendants appeal those verdicts. The sons cross-appeal the district court's directed verdict in defendants' favor on their claims, and its award of costs to defendants for those claims.

We reverse the judgments against SSC and Administrative Services on both claims, reverse the judgment against Alpine on Ms. Reigel's outrageous conduct claim, vacate the judgment against Alpine on Ms. Reigel's negligence claim, reverse the judgment and costs award against the sons, and remand the case for a new trial on plaintiffs' negligence claim against Alpine.

## I. Factual Background

The following facts are taken from the record of the trial, which we view in the light most favorable to the jury's verdicts. *See Fair v. Red Lion Inn,* 943 P.2d 431, 436 (Colo.1997) (in ruling on a motion for directed verdict, court must view the evidence in the light most favorable to the nonmoving party); *Hildebrand v. New Vista Homes II, LLC,* 252 P.3d 1159, 1172 (Colo.App.2010) (same standard applies in reviewing a challenge to the sufficiency of the evidence).

After undergoing surgery for an injury unrelated to this appeal, Mr. Reigel was admitted to Alpine for a one-week rehabilitation period.

One day before his scheduled discharge, Mr. Reigel began experiencing health problems. By 2:30 p.m. that day, his heart rate had dropped to fifty-four beats per minute from its normal range of around eighty beats per minute, his blood pressure had dropped, and he had developed nausea. According to Dr. Ethan Cary, Mr. Reigel's attending doctor at Alpine, the nurse assigned to Mr. Reigel, Sarah Pemkiewicz, told Dr. Cary only about Mr. Reigel's nausea. Ms. Pemkiewicz also failed to adequately chart Mr. Reigel's condition or to monitor his vital signs.[2]

By 10:00 p.m., Mr. Reigel's heart rate had risen to 134 beats per minute. Dr. Cary was not notified. Mr. Reigel's fluid intake for the day had been less than one-fifth of the recommended amount.

Mr. Reigel did not take in any fluids the following day. According to Ms. Reigel, he was disoriented, could not focus, could not urinate, and was sweating though his skin was cold and clammy. He also experienced increasing shortness of breath. After taking Mr. Reigel's vital signs and listening to his lungs, Ms. Pemkiewicz called Dr. Cary to report the shortness of breath. At about 1:10 p.m., Dr. Cary ordered a chest x-ray, a urinalysis, and several other lab tests to be done as soon as possible. Ms. Pemkiewicz did not take the urinalysis because Mr. Reigel was unable to urinate, but she ordered the x-ray and the other lab tests.

In the meantime, Ms. Reigel grew increasingly concerned about her husband's condition. Between 1:00 p.m. and 4:00 p.m., she asked Ms. Pemkiewicz, another nurse, and Jackie Cho (Mr. Reigel's case manager and Alpine's director of social services) about either having a doctor or a registered nurse evaluate Mr. Reigel or transferring him to a hospital. According to Ms. Reigel, the nurses refused her requests because they were either involved in completing the ordered tests or waiting for the lab results. Ms. Cho also refused the requests, telling Ms. Reigel in a "caustic" tone of voice that if an emergency existed "we would call an ambulance."

At some point after 2:00 p.m., Ms. Pemkiewicz received the chest x-ray results and reported those results to Dr. Cary, who told her to transfer Mr. Reigel to a hospital. She called an ambulance at about 4:30 p.m.

According to one of the paramedics on duty, there was no nurse in Mr. Reigel's room when he arrived at Alpine. Due to a delay caused by one of Alpine's nurses in obtaining the transfer paperwork, it took about thirty minutes to transfer Mr. Reigel to a hospital that was "almost across the street" from Alpine.

---

**2.** Ms. Pemkiewicz did not note on Mr. Reigel's chart that he had developed nausea. Further, when she administered the nausea medication Dr. Cary had prescribed, she failed either to take Mr. Reigel's vitals or to note his vital sign readings on his chart. When she did take his heart rate, she did not look at his chart to see what his normal heart rate range was. The State Board of Nursing for Colorado later issued a letter of admonition regarding Ms. Pemkiewicz's failure to timely document her care of Mr. Reigel.

The emergency room doctor who treated Mr. Reigel, Dr. Michelle Reeves, concluded that he had been having a heart attack since the previous day. Mr. Reigel died a few hours later.

## II. Defendants' Appeal

On appeal, defendants contend that the district court erred in (1) denying their motion for directed verdicts on Ms. Reigel's negligence claim; (2) denying their motion for directed verdicts on Ms. Reigel's outrageous conduct claim; (3) allowing Ms. Reigel to recover punitive damages; and (4) admitting evidence from a website concerning Alpine's history of treatment deficiencies and comparing its care to that of other nursing facilities. We agree in part with defendants' first contention and remand the case for a new trial on the negligence claim against Alpine only. We also agree with defendants' second contention. Consequently, we address their third and fourth contentions only to the extent relevant to the case on remand.

### A. The Defendants Other Than Alpine Were Entitled to a Directed Verdict on the Negligence Claim

SSC and Administrative Services (collectively, the Sava Defendants) contend that the district court erred in denying their motion for directed verdicts on the negligence claim. Specifically, they argue that Ms. Reigel did not establish that they owed a duty of care to Mr. Reigel because she did not present evidence showing that she could impute Alpine's employees' alleged negligence to the Sava Defendants by piercing the corporate veil. Ms. Reigel does not dispute that she failed to prove a basis for piercing the corporate veil, but argues that the Sava Defendants owed a duty of care to Mr. Reigel because the evidence showed that Alpine's employees were their agents. We conclude that Ms. Reigel did not present evidence to establish that Alpine's employees were the Sava Defendants' agents. It follows that the district court erred in denying the Sava Defendants' motion for directed verdicts on the negligence claim.

### 1. The Issue Was Preserved for Review

Initially, we reject Ms. Reigel's contention that the Sava Defendants failed to preserve this issue for appellate review because they did not object specifically to the jury instruction stating, "Jackie Cho, Sarah Pemkiewicz, and [another nurse who treated Mr. Reigel] were the agents of the defendants, at the time of this occurrence. Therefore, any act or omission of the agent was in law the act or omission of the defendants."

The Sava Defendants moved for directed verdicts based on Ms. Reigel's alleged failure to present evidence that they owed Mr. Reigel a duty of care. By doing so, they properly preserved the issue for our review. *See In re Rosen,* 198 P.3d 116, 119 (Colo.2008) (the issue whether a party is entitled to judgment as a matter of law is preserved by moving for a directed verdict); *Omedelena v. Denver Options, Inc.,* 60 P.3d 717, 727 (Colo.App. 2002) (where one defendant joined in another defendant's motion for a directed verdict, it preserved the issue therein for appellate review even though it did not submit an alternative jury instruction regarding the issue); *see also Aspen Highlands Skiing Corp. v. Aspen Skiing Co.,* 738 F.2d 1509, 1517–18 (10th Cir.1984), *aff'd,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985).

### 2. Standard of Review

We review a district court's ruling on a motion for directed verdict de novo. *Churchill v. Univ. of Colo. at Boulder,* 293 P.3d 16, 34 (Colo.App.2010) *(cert. granted* 2011 WL 2176390 (May 31, 2011)). Where the motion concerns a question of fact, we consider whether the evidence, viewed in the light most favorable to the nonmoving party, " 'compels the conclusion that reasonable jurors could not disagree and that no evidence or inference [therefrom] has been received at trial upon which a verdict against the moving party could be sustained.' " *Hildebrand,* 252 P.3d at 1163 (quoting *Brossia v. Rick Constr., L.T.D. Liab. Co.,* 81 P.3d 1126, 1131 (Colo.App.2003)). However, where the motion concerns a question of law, we "may make an independent determination of [the] legal question." *Omedelena,* 60 P.3d at 722;

*accord Tricon Kent Co. v. Lafarge N. Am., Inc.,* 186 P.3d 155, 159 (Colo.App.2008).

■■■ Whether a particular defendant owes a legal duty to a particular plaintiff is ordinarily a question of law. *See Univ. of Denver v. Whitlock,* 744 P.2d 54, 57 (Colo. 1987). But here the existence of a duty ultimately turns on whether Alpine's employees were the Sava Defendants' agents. Whether such a relationship exists is ordinarily a question of fact. *See Stortroen v. Beneficial Finance Co.,* 736 P.2d 391, 395 (Colo.1987); *Gorsich v. Double B Trading Co., Inc.,* 893 P.2d 1357, 1361 (Colo.App. 1994). Therefore, we will review the Sava Defendants' contention assuming it presents a factual question.

### 3. The Sava Defendants Did Not Owe a Duty of Care to Mr. Reigel

To recover on a wrongful death claim founded on negligence, a plaintiff must show, among other things, that the defendant owed the decedent a duty of care. *See Solano v. Goff,* 985 P.2d 53, 54–55 (Colo.App.1999); *see also Day v. Johnson,* 255 P.3d 1064, 1068–69 (Colo.2011); *Greenberg v. Perkins,* 845 P.2d 530, 533 (Colo.1993).

Ms. Reigel's theory that the Sava Defendants owed Mr. Reigel a duty of care is premised on the precept that a principal is liable for negligent acts its agent commits on behalf of the principal that are within the scope of the agency relationship. *Smith v. Multi–Fin. Secs. Corp.,* 171 P.3d 1267, 1271 (Colo.App.2007); *see Willey v. Mayer,* 876 P.2d 1260, 1264 (Colo.1994). She contends that the Sava Defendants could be held liable as principals for the allegedly negligent actions in this case because evidence presented at trial showed the following: (1) Earl Woomer, Alpine's nursing home administrator, and Ms. Pemkiewicz were "Sava" employees; (2) the nurse consultant to Alpine's director of nursing, Sharon Darlene Brown, was a "Sava" employee; (3) when Mr. Woomer filled out Alpine's license application to operate a health care facility, Administrative

Services provided him with a corporate structure document that he attached to the application; and (4) Administrative Services provided management services to Alpine.[3]

The evidence that Mr. Woomer worked for "Sava" was from his deposition testimony. However, at trial, Mr. Woomer clarified that he had been an employee of Alpine, not of either of the Sava Defendants. He noted that when he had been deposed, he had believed he had worked for "Sava Senior Care," but when he later reviewed his payroll checks, he saw that they said Alpine. No documentary evidence was introduced showing that Mr. Woomer worked for an entity other than Alpine.

Similarly, Ms. Pemkiewicz twice testified that she "work[ed] for Alpine." And, though, on cross-examination by plaintiffs' counsel, she responded "Yes" to the question, "And the company that you worked for was Sava Senior Care; is that right?" neither she nor counsel specified whether "Sava Senior Care" was SavaSeniorCare L.L.C., SavaSeniorCare Administrative Services, L.L.C., or some other entity. Nor can we reasonably infer which company she meant. Ms. Reigel suggests, without record support, that Ms. Pemkiewicz meant SSC. The record shows that counsel and sometimes witnesses routinely referred to Sava without drawing any distinction among the defendant entities.

■■■ Consequently, we conclude that, viewing the testimony in the light most favorable to Ms. Reigel, she did not present sufficient evidence to prove that Mr. Woomer or Ms. Pemkiewicz were employees of one of the Sava Defendants. She argues no other theory under which they could be regarded as agents of one of the Sava Defendants. *See Hildebrand,* 252 P.3d at 1163; *cf. Catholic Archdiocese of Denver v. City & County of Denver,* 741 P.2d 333, 337–38 (Colo.1987) (the district court erred in finding that the news carriers were the news publishers' agents where the virtually uncontradicted evidence was that the carriers were not the publishers'

---

**3.** Ms. Reigel does not argue that there was any evidence that Alpine itself was an agent of the Sava Defendants. *See First Horizon Merch. Servs., Inc. v. Wellspring Capital Mgmt., LLC,* 166

P.3d 166, 177 (Colo.App.2007) (an agent may be a corporation as well as an individual). Consequently, we do not address that issue.

employees); *Colo. Ranch Estates, Inc. v. Halvorson*, 163 Colo. 146, 152, 428 P.2d 917, 920 (1967) (the district court erred in entering judgment against one defendant where the allegations were only sufficient to sustain a judgment against another defendant).

Ms. Brown testified at trial that she had reported "[i]n a fashion" to a nurse consultant who had helped Alpine correct its treatment deficiencies. When asked, "Do you know the name of the company that [the nurse consultant] worked for?" Ms. Brown responded, "No. I guess she was employed by Sava." Not only was this testimony seemingly pure speculation, *see Cowin & Co. v. Medina*, 860 P.2d 535, 539 (Colo.App.1992) (mere guesses are insufficient evidence to establish an allegation), Ms. Brown did not identify to which Sava Defendant she was referring, if either. And although Mr. Woomer later testified that the consultant was employed by "Sava Senior Care, that's all I know," he later clarified that he had been using SavaSeniorCare as a generic term, not referring to a specific entity.

■ The mere fact that Administrative Services provided a corporate structure document to Mr. Woomer for Alpine's license application is clearly insufficient to establish an agency relationship between Administrative Services and Mr. Woomer. *See W. Fire Truck, Inc. v. Emergency One, Inc.*, 134 P.3d 570, 575 (Colo.App.2006) (" 'Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his ... behalf and subject to his ... control, and consent by the other so to act.' " (ultimately quoting Restatement (Second) of Agency § 1(1) (1958))); *cf. Moses v. Diocese of Colo.*, 863 P.2d 310, 325 (Colo.1993) (there was suf-

ficient evidence of an agency relationship where the defendants possessed and exercised the right of control over the manner of performing work and of hiring, compensating, and counseling the employee).

■ Finally, we reject Ms. Reigel's contention that evidence demonstrated that Administrative Services had an agency relationship with Alpine's employees because it provided management services to Alpine. Citing only to Mr. Woomer's testimony, Ms. Reigel alleges that Alpine paid Administrative Services a management fee in exchange for its help in correcting Alpine's treatment deficiencies, among other things.[4] However, Mr. Woomer testified that he was not sure to which Sava company Alpine had paid the management fee. When asked specifically what Administrative Services had done for Alpine, Mr. Woomer recalled only that it had recruited Alpine's therapists.[5] Alpine's therapists did not commit any of the allegedly negligent actions in this case, and there was no evidence that Administrative Services provided any clinical services to Alpine patients. Further, and in any event, Ms. Reigel cites no authority for the proposition that one company's mere payment to another for services renders the former's employees general agents of the latter.

Therefore, we conclude that the evidence was not sufficient to enable reasonable jurors to agree that either of the Sava Defendants owed a duty of care to Mr. Reigel on the theory that Alpine's employees were their agents. It follows that the district court erred in denying the Sava Defendants' motion for directed verdicts. Accordingly, we reverse the judgment entered against the Sava Defendants on the negligence claim.[6]

---

4. The district court found that Annaliese Impink, the senior vice president and chief operations counsel of SavaSeniorCare L.L.C., had testified in her deposition (the transcript of which was read at trial) that Administrative Services had "provided services to Alpine, including assistance with quality assurance, such as helping to cure deficiencies." However, our review of Ms. Impink's testimony indicates that she never referred to Administrative Services or to services it allegedly provided to Alpine.

5. Mr. Woomer also conjectured that "[Administrative Services] helped us administratively,

which had to do with probably offices or accounts payable, accounting, things like that."

6. Ms. Reigel argues that if we conclude that she did not establish that the Sava Defendants owed Mr. Reigel a duty of care, we should not reverse the damages awards against them, but rather should simply remand for the district court to apportion those damages to Alpine. Because we conclude in section II.B.2 below that the judgment on her negligence claim against Alpine must be vacated, we do not address this argument.

## B. The Negligence Verdict Against Alpine Must Be Vacated But Alpine Was Not Entitled to a Directed Verdict on the Negligence Claim

Alpine contends that the evidence was insufficient to support a jury finding of causation in connection with the negligence claim. Its initial premise for this contention is that the court concluded erroneously that to establish causation, Ms. Reigel was only required to present evidence that the alleged negligence substantially increased the risk of harm to Mr. Reigel—a standard more easily met than the "but-for" causation test dictated by Colorado Supreme Court precedent.[7] The court applied the increased risk standard in denying defendants' motion for directed verdicts and in subsequently instructing the jury on causation. Alpine argues that the jury's negligence verdict cannot stand, and that, applying the correct test for causation, the evidence was insufficient even to present a jury question of the negligence claim.

We agree with Alpine that the district court erred by applying an incorrect test for causation. Because the court instructed the jurors that the incorrect test governed their deliberations, we must vacate the judgment. But though the judgment must be vacated, we disagree with Alpine that it was entitled to a directed verdict because we conclude that the evidence would have been sufficient to support a verdict under the correct test.

### 1. The District Court Applied an Incorrect Test of Proximate Cause

#### a. Standard of Review

■ The issue of the correct test of proximate cause is a legal one. *See Highlands Ranch University Park, LLC v. Uno of Highlands Ranch, Inc.,* 129 P.3d 1020, 1026 (Colo.App.2005) (whether the district court applied a correct legal standard is a question of law). Therefore, our review of that issue is de novo. *See Freedom Colo. Info., Inc. v. El Paso County Sheriff's Dep't,* 196 P.3d 892, 897 (Colo.2008).

#### b. Analysis

■ To recover on a negligence claim, a plaintiff must show that the defendant's alleged negligence proximately caused the claimed injury. *Callaham v. First Am. Title Ins. Co.,* 837 P.2d 769, 771 (Colo.App.1992). Proximate cause has two aspects: causation in fact and legal causation. *See Ludlow v. Gibbons,* —— P.3d ——, ——, 2011 WL 5436481 (Colo.App.2011); *Moore v. W. Forge Corp.,* 192 P.3d 427, 436 (Colo.App.2007). Alpine's contention does not concern legal causation, and consequently we do not address it.

■ As to causation in fact,

> "[t]he test ... is the 'but for' test—whether, but for the alleged negligence, the harm would not have occurred. The requirement of 'but for' causation is satisfied if the negligent conduct in a 'natural and continued sequence, unbroken by any efficient, intervening cause, produce[s] the result complained of, and without which the result would not have occurred.' "

*N. Colo. Med. Ctr., Inc. v. Comm. on Anticompetitive Conduct,* 914 P.2d 902, 908 (Colo. 1996) (quoting *Smith v. State Comp. Ins. Fund,* 749 P.2d 462, 464 (Colo.App.1987)); *accord Graven v. Vail Assocs., Inc.,* 909 P.2d 514, 520 (Colo.1995). Where some events unrelated to the defendant's conduct may also have contributed to bringing about the claimed injury, the plaintiff must show that the defendant's alleged negligence was a substantial factor in producing the injury. *N. Colo. Med. Ctr.,* 914 P.2d at 908; *Graven,* 909 P.2d at 520–21; *Smith,* 749 P.2d at 464; *see also Rodriguez v. Healthone,* 24 P.3d 9, 15 (Colo.App.2000), *aff'd in part & rev'd in part on other grounds,* 50 P.3d 879 (Colo.2002).

■ The plaintiff must prove causation in fact by a preponderance of the evidence. *Kaiser Found. Health Plan of Colo. v. Sharp,* 741 P.2d 714, 719 (Colo.1987); *Allen v. Martin,* 203 P.3d 546, 565 (Colo.App. 2008). Causation is a question of fact for the jury unless the facts are undisputed and

7. The Sava Defendants also raise this contention, but because we have decided that they were otherwise entitled to directed verdicts, we address it only as it pertains to the negligence claim against Alpine.

reasonable minds could draw but one inference from them. *Allen,* 203 P.3d at 566; *Sanderson v. Heath Mesa Homeowners Ass'n,* 183 P.3d 679, 683 (Colo.App.2008).

Here, in denying defendants' motion for directed verdicts, the district court concluded that reasonable jurors could determine that defendants had caused Mr. Reigel's death because Ms. Reigel had introduced evidence that the alleged negligence had substantially increased the risk of harm to Mr. Reigel or had deprived him of a significant chance to avoid death and was, therefore, a substantial factor in his death.[8] The court also subsequently rejected defendants' tendered instruction on but-for causation and instead instructed the jury, as relevant here, as follows:

> The word "cause" as used in these instructions means an act or failure to act that in natural and probable sequence produced the claimed injury. It is a cause without which the claimed injury would not have happened.
>
> If more than one act or failure to act contributed to the claimed injury, then each act or failure to act may have been a cause of the injury. A cause does not have to be the only cause or the last or nearest cause. It is enough if the act or failure to act joins in a natural and probable way with some other act or failure to act to cause some or all of the claimed injury.
>
> One's conduct is not a cause of another's death, however, if, in order to bring about such death, it was necessary that his or her conduct combine or join with an intervening cause that also contributed to cause the death. An intervening cause is a cause that would not have been reasonably foreseen by a reasonably careful person under the same or similar circumstances.
>
> . . . .
>
> For the plaintiff to recover from the defendants on her claim of negligence, you must find that all of the following have been proved by a preponderance of the evidence:
>
> 1) Dennis Reigel died;

> 2) The defendants were negligent; and
>
> 3) The defendants' negligence was a cause of the plaintiff's damage.
>
> If you find that any one or more of these three statements has not been proved, then your verdict must be for the defendants.
>
> On the other hand, if you find that all of these three statements have been proved, then your verdict must be for the plaintiff.
>
> *If you find that Alpine's negligence increased the risk of Dennis Reigel's death or deprived Dennis Reigel of some significant chance to avoid death, you may also find that Alpine's negligence was a cause of Dennis Reigel's death.*

(Emphasis added.)

The court based its decisions to deny the motion for directed verdicts and to instruct the jury concerning an increase in the risk of death on *Sharp v. Kaiser Foundation Health Plan of Colorado,* 710 P.2d 1153 (Colo.App. 1985) (*Sharp I*), *aff'd,* 741 P.2d 714 (Colo. 1987). In *Sharp I,* the division held that "the jury should be allowed to decide the issue of causation [where] there is expert testimony" that the defendants' conduct was a substantial factor in causing the injury in that it "substantially increased [the] plaintiff's risk of the resulting harm or substantially diminished the chance of recovery." 710 P.2d at 1155.

On certiorari review, the supreme court did not reach the increased risk issue because it concluded that the plaintiffs had presented sufficient evidence of but-for causation. *Sharp,* 741 P.2d at 720.

Alpine contends that the "increased risk" standard articulated in *Sharp I* is inconsistent with the but-for test as applied in Colorado. It notes that the Tenth Circuit Court of Appeals has held that the Colorado Supreme Court would not agree with *Sharp I*'s increased risk standard. *June v. Union Carbide Corp.,* 577 F.3d 1234 (10th Cir.2009).

In *June,* the Tenth Circuit began by recognizing that in the years since *Sharp I* was

---

**8.** Defendants' counsel argued in open court and filed a written motion specifically challenging this theory of causation in connection with de-

fendants' motion for directed verdicts. Defendants also objected to plaintiffs' proposed jury instruction on this theory of causation.

decided, the Colorado Supreme Court has consistently followed the but-for causation test. *Id.* at 1238–39. The court then determined that *Sharp I*'s reasoning was inconsistent with that test and was analytically flawed because it took certain provisions of the Restatement (Second) of Torts out of context. *See id.* at 1239–41, 1245 (comparing Restatement (Second) of Torts §§ 430–433, with Restatement (Third) of Torts §§ 26–27, 29, and Proposed Final Draft of the Restatement (Third) of Torts: Liability for Physical Harm). The court noted that by looking only to sections 430, 431, and 433, which address legal causation and the substantial factor concept, "one could easily conclude that courts ... have substantial leeway to depart from but-for causation in imposing liability." *Id.* at 1241. However, the court noted that section 432 states:

> (1) Except as stated in Subsection (2), the actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent.
>
> (2) If two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about.

Thus, the court concluded that the allegedly negligent conduct of the defendant must satisfy one of section 432's alternative requirements before it can even qualify as a substantial factor under the other Restatement sections. *Id.* Consequently, to establish causation under Colorado law, a plaintiff must show either that (1) but for the defendant's alleged negligence, the claimed injury would not have occurred, or (2) the defendant's alleged negligence was a necessary component of a causal set that would have caused the injury. *Id.* at 1245.

Though we are not bound by the Tenth Circuit's reasoning, we find it persuasive, and therefore decline to follow *Sharp I. See Valentine v. Mountain States Mut. Cas. Co.*, 252 P.3d 1182, 1195 (Colo.App.2011) (a division of the court of appeals is not bound by another division's decision).

■ As the Tenth Circuit recognized, the Colorado Supreme Court has continued to adhere to the but-for test. *See, e.g., N. Colo. Med. Ctr.*, 914 P.2d at 908; *Graven*, 909 P.2d at 520. Though the court has spoken in terms of the defendant's negligence being a "substantial factor" where other potential causes may be at play, the court has not retreated from the requirement that the defendant's conduct be a cause without which the injury would not have occurred. *See N. Colo. Med. Ctr.*, 914 P.2d at 908; *Graven*, 909 P.2d at 520–21; *see also Viner v. Sweet*, 30 Cal.4th 1232, 135 Cal.Rptr.2d 629, 70 P.3d 1046, 1050–51 (2003) (under Restatement (Second) of Torts § 432, the substantial factor test subsumes the but-for causation test; however, it does not abrogate the requirement that the plaintiff must prove that but for the alleged negligence, the injury would not have occurred). As both a logical and practical matter, the fact that a defendant's conduct increased the victim's risk of injury does not necessarily mean that the defendant's conduct was a but-for cause of the injury or a necessary component of a causal set of events that would have caused the injury. Put another way, the victim's injury may well have occurred regardless of whether the defendant's conduct increased the risk that it would occur. Thus, the increased risk of harm test articulated in *Sharp I* is inconsistent with Colorado Supreme Court precedent.

Consequently, we conclude that the district court erred in ruling that Ms. Reigel was only required to present evidence that Alpine's alleged negligence increased Mr. Reigel's risk of death or deprived him of a significant chance to avoid death.

### 2. The Negligence Verdict Against Alpine Must Be Vacated

■ We reject Ms. Reigel's assertion that any error in instructing the jury as to increased risk was harmless because the jury instructions, read as a whole, correctly instructed the jury on the but-for causation standard. *See* C.R.C.P. 61.

It is true, as noted above, that one instruction said, "The word 'cause' as used in these

instructions means an act or failure to act that in natural and probable sequence produced the claimed injury. It is a cause without which the claimed injury would not have happened. . . ." This appears to be a correct statement of the law. And the other instruction correctly recited the elements of the negligence claim. But it also said, in the last paragraph: "If you find that Alpine's negligence increased the risk of Dennis Reigel's death or deprived Dennis Reigel of some significant chance to avoid death, you may also find that Alpine's negligence was a cause of Dennis Reigel's death."

The jury may well have viewed the latter instruction as expounding on the definition of causation in the last paragraph of the first instruction—that is, that the but-for test could be satisfied by evidence of a substantial increase in the risk. Thus, the instructions allowed a verdict in Ms. Reigel's favor even if the jury concluded that Alpine's alleged negligence was not a but-for cause of Mr. Reigel's death in the sense contemplated by Colorado Supreme Court precedent. Consequently, we conclude that the district court's error was not harmless. *See Young v. Colo. Nat'l Bank*, 148 Colo. 104, 125, 365 P.2d 701, 713 (1961) ("[T]he giving of incompatible instructions on the burden of proof is fatal error."); *Steward Software Co., LLC v. Kopcho*, 275 P.3d 702, —— (Colo.App.2010) (*cert. granted* 2011 WL 1106763 (Mar. 28, 2011)) (same) ("error in one instruction cannot be rendered harmless by the mere giving of other instructions that state the law correctly"; citing *Harper v. James*, 246 Ind. 131, 203 N.E.2d 531, 533–34 (1965)).

### 3. Alpine Was Not Entitled to a Directed Verdict on the Negligence Claim

Though the district court erred in applying the test for proximate cause to Alpine's motion for directed verdict, it does not necessarily follow that the court erred in denying the motion. Rather, we must determine whether the evidence (and inferences that reasonably could have been drawn therefrom) would have supported a verdict against Alpine under the correct test. Viewing the evidence in the light most favorable to Ms. Reigel, we conclude that it would have.

To establish causation, " '[t]he plaintiff need not prove with absolute certainty that the defendant's conduct caused the plaintiff's harm . . . [h]owever, the plaintiff must establish causation beyond mere possibility or speculation.' " *Nelson v. Hammon*, 802 P.2d 452, 457 (Colo.1990) (ultimately quoting *City of Longmont v. Swearingen*, 81 Colo. 246, 251, 254 P. 1000, 1002 (1927)); *see* Restatement (Second) of Torts § 433B cmt. b (1965) ("[The plaintiff] is not required to eliminate entirely all possibility that the defendant's conduct was not a cause. It is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not.").

Initially, we reject Alpine's contention that Ms. Reigel failed to present any evidence of but-for causation because no witness testified that if Alpine had called an ambulance at the first sign of trouble, Mr. Reigel would not have died. Such conclusive testimony is not necessary to prove causation. *See Nelson*, 802 P.2d at 457; *Boatright v. Berkley United Methodist Church*, 518 P.2d 309, 310 (Colo. App.1974) (not published pursuant to C.A.R. 35(f)) (causation may be proved by circumstantial evidence); *see also Hildebrand*, 252 P.3d at 1163 (in resolving a motion for directed verdict, the court must consider whether "no evidence *or inference [therefrom]*" has been received at trial that can sustain the verdict (emphasis added)).

Ms. Reigel presented evidence from which reasonable jurors could conclude that had Mr. Reigel been taken to the hospital immediately after he allegedly began having the heart attack, he would not have died.

For example, Dr. Cary testified that when a person becomes dehydrated, he has a greater risk of suffering a heart attack. He then confirmed that if Mr. Reigel was dehydrated on the day before he was transferred to the hospital, it was likely that the dehydration affected his heart rate. As noted, on that day, Mr. Reigel's fluid intake was less than one-fifth of the recommended amount and his heart rate had fluctuated between 54 and 134 beats per minute. Dr. Cary also testified that the dehydration could have con-

tributed to Mr. Reigel having a heart attack. Though Dr. Cary then said he was not sure whether dehydration would have been a substantial contributing factor in triggering the heart attack because Mr. Reigel had "so many other risk factors for heart disease," reasonable jurors could infer from this evidence that Mr. Reigel would not have had the heart attack, and consequently would not have died, had he not been dehydrated.

Alpine's expert in noninvasive cardiology, Dr. Philip Wolf, testified that if a person who had a massive heart attack like Mr. Reigel's is able to have an angioplasty procedure within ninety minutes of the heart attack beginning, there is a ninety percent chance that the procedure will be successful. He later clarified that the ninety percent success rate figure did not apply in Mr. Reigel's case because (1) in his opinion, nobody could have diagnosed him with a heart attack earlier, and (2) the cardiologist who had treated Mr. Reigel after he arrived at the emergency room, Dr. Carlos Mendoza, had determined that Mr. Reigel had too many other health problems to make immediate surgery a viable option.[9] However, Ms. Reigel presented evidence disputing both bases for this latter conclusion, thereby suggesting that the ninety percent success rate figure would have applied in Mr. Reigel's case.

As to the first basis, Dr. Wolf's opinion was that Mr. Reigel did not begin to have a heart attack until around the time he arrived at the emergency room. A reasonable juror could infer that Dr. Wolf's opinion about the alleged inability to diagnose Mr. Reigel's heart attack earlier was in turn based on his opinion that Mr. Reigel was not having a heart attack before he arrived at the emergency room. However, as noted, Dr. Reeves testified that Mr. Reigel had begun having a heart attack on the previous day. And in Mr. Reigel's emergency room admission report, which Ms. Reigel introduced at trial, one of Mr. Reigel's doctors said that he also believed Mr. Reigel's heart attack had begun twenty-four to forty-eight hours before he arrived at the emergency room.[10]

As to the second basis, Dr. Reeves testified that if Mr. Reigel had come to the hospital earlier, with stable vital signs, and he had not been on blood thinning medication or experiencing renal failure, she would have told the cardiologist that there was less risk associated with a heart surgery procedure. The presence of the blood thinning medication was allegedly due to Alpine's nursing staff's negligence in giving Mr. Reigel two doses of blood thinning medication after Dr. Cary had ordered that the medication be discontinued. The renal failure had allegedly begun early in the afternoon of the day Mr. Reigel was transferred to the hospital due to poor blood flow resulting from Mr. Reigel's untreated heart attack and dehydration.

Similarly, according to evidence at trial, Dr. Mendoza had given three reasons why he did not want to immediately perform an angioplasty procedure on Mr. Reigel: (1) Mr. Reigel was having problems with his blood clotting; (2) he was experiencing renal failure; and (3) he had difficulty lying flat because of shortness of breath. As noted, the first two problems were allegedly caused by Alpine's employees' negligence. And the third problem, Mr. Reigel's increasing shortness of breath, did not begin until the day he was transferred to the hospital.

■ Based on this evidence, we conclude that reasonable jurors could agree that but for Alpine's employees' alleged negligence, Mr. Reigel would have been (1) able to have an angioplasty procedure, and (2) among the ninety percent of people for whom the procedure is a success.

9. Dr. Wolf testified that Mr. Reigel's non-negligence-related medical conditions included terminal lung cancer, emphysema, a recent history of pulmonary emboli, pulmonary hypertension, sleep apnea, and "massive" obesity. Consequently, Dr. Wolf also testified that had he been the doctor treating Mr. Reigel, he would have told the surgeon not to operate because Mr. Reigel "was in no shape to go through the surgery and to survive."

10. Regarding the alleged difficulty in diagnosing Mr. Reigel, we also observe that Dr. Wolf testified it would have been difficult for a doctor to have diagnosed Mr. Reigel with a heart attack when he arrived at the emergency room. However, he later admitted that one of the emergency room doctors had actually been able to diagnose Mr. Reigel with a heart attack.

In sum, we conclude that Ms. Reigel's evidence was sufficient to withstand Alpine's motion for directed verdict. *Compare Nelson,* 802 P.2d at 456–57 (where a doctor testified that one gram of penicillin "might have had some effect in reducing the chance" the plaintiff would have developed the condition, but that two grams was the standard recommendation, the testimony was nonetheless sufficient to support an inference that one gram of penicillin would have prevented the condition), *and Johnson v. Nat'l R.R. Passenger Corp.,* 989 P.2d 245, 249–50 (Colo. App.1999) (where a surgeon testified that if the plaintiff had a preexisting hip condition, there was a ten to fifteen percent chance that he would have spontaneously recovered, there was sufficient evidence of causation for the jury to decide that the hip condition allegedly caused by the defendant would not have required surgery but for the conduct at issue), *with Braud v. Woodland Village L.L.C.,* 54 So.3d 745, 751–52 (La.Ct.App.2010) (where there was no testimony that the alleged negligence caused or contributed to the decedent's death, there was no evidence that the decedent suffered an injury that he would not otherwise have suffered); *see also Coffran v. Hitchcock Clinic, Inc.,* 683 F.2d 5, 10–11 (1st Cir.1982) (the plaintiff introduced sufficient evidence of causation where one expert testified that there was a fifty percent chance that if the defendants had performed the test they allegedly negligently failed to perform, they could have diagnosed the condition and prevented the injury; though another expert disagreed, the jury was free to credit the first expert's testimony); *Mayes v. Bryan,* 139 Cal.App.4th 1075, 44 Cal.Rptr.3d 14, 25 (2006) (causation is proven where there is sufficient evidence for the jury to infer that absent the defendant's negligence, there was a reasonable medical probability the patient would have obtained a better result).

Accordingly, though the district court applied the wrong test in ruling on Alpine's motion for directed verdict, the court did not err in denying the motion. We vacate the judgment entered against Alpine on Ms. Reigel's negligence claim and remand for a new trial on that claim.

### C. Alpine Was Entitled to a Directed Verdict on the Outrageous Conduct Claim

■ Defendants contend that the district court erred in denying their motion for directed verdicts on Ms. Reigel's outrageous conduct claim because (1) the alleged conduct was not sufficiently outrageous as a matter of law, and (2) Ms. Reigel did not present evidence that would allow the jury to attribute that conduct to the Sava Defendants. Because we have decided above that there is insufficient evidence that the actions of Alpine's employees could be attributed to the Sava Defendants, we need only address the first contention.

■ The elements of an outrageous conduct claim are "(1) the defendant engaged in extreme and outrageous conduct, (2) recklessly or with the intent of causing the plaintiff severe emotional distress, and (3) causing the plaintiff severe emotional distress." *Pearson v. Kancilia,* 70 P.3d 594, 597 (Colo. App.2003).

■ The level of outrageousness required to constitute extreme and outrageous conduct is extremely high. *Coors Brewing Co. v. Floyd,* 978 P.2d 663, 666 (Colo.1999); *Pearson,* 70 P.3d at 597; *McCarty v. Kaiser-Hill Co., L.L.C.,* 15 P.3d 1122, 1126–27 (Colo. App.2000). The conduct must be " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Coors Brewing Co.,* 978 P.2d at 666 (quoting Restatement (Second) of Torts § 46 (1965)); *accord Tracz v. Charter Centennial Peaks Behavioral Health Sys., Inc.,* 9 P.3d 1168, 1175 (Colo.App.2000). "Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities are insufficient." *Pearson,* 70 P.3d at 597; *see also* Restatement (Second) of Torts § 46 cmt. d.

■ However, "[c]onduct, otherwise permissible, may become extreme and outrageous if it is an abuse by the actor of a position in which he has actual or apparent authority over the other, or the power to affect the other's interests." *Zalnis v. Thor-*

*oughbred Datsun Car Co.*, 645 P.2d 292, 294 (Colo.App.1982); *see also* Restatement (Second) of Torts § 46 cmt. e. Conduct may also become outrageous where the defendant proceeds though he knows that the plaintiff "is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity." Restatement (Second) of Torts § 46 cmt. f; *see English v. Griffith,* 99 P.3d 90, 93 (Colo.App.2004). Nevertheless, in both scenarios, a defendant is still not liable for mere insults, indignities, or annoyances that are not extreme or outrageous. Restatement (Second) of Torts § 46 cmts. e, f ("It must be emphasized again, however, that major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough.").

An outrageous conduct claim may be submitted to the jury only if reasonable persons could differ on whether the defendant's conduct was sufficiently outrageous. Whether reasonable persons could differ on that issue is a question of law that we review de novo, considering the totality of the evidence pertaining to the defendant's conduct. *Han Ye Lee v. Colo. Times, Inc.,* 222 P.3d 957, 963 (Colo.App.2009); *Green v. Qwest Servs. Corp.,* 155 P.3d 383, 385 (Colo.App.2006); *Pearson,* 70 P.3d at 597.

Ms. Reigel's evidence of outrageous conduct was as follows.

- Alpine employees allegedly refused Ms. Reigel's requests, while she was crying, to send Mr. Reigel to the hospital or have a registered nurse or doctor evaluate him.
- When Ms. Reigel went to see Ms. Cho about the aforementioned requests, Ms. Cho allegedly said, "in the most caustic voice [Ms. Reigel had] ever heard, [']Well, if it was an emergency, we would call an ambulance.[']"

- The Alpine employees responded to Ms. Reigel's requests in a manner that made her feel "[l]ike [she] was going crazy. Like they thought [she] was totally over-reacting, like [she] was so upset. Why is she so upset, we're doing all these things, we're doing all these tests, we're waiting for results."
- Between 2:45 and 4:30 p.m. on the last day Mr. Reigel was at the facility, no nurse or other Alpine employee allegedly checked on Mr. Reigel.
- Ms. Pemkiewicz allegedly falsified an entry on Mr. Reigel's chart by noting that at 4:30 p.m. his blood pressure was normal. Ms. Reigel testified that neither Ms. Pemkiewicz nor any other Alpine employee was in Mr. Reigel's room at that time. And, when the paramedics took his blood pressure four to five minutes later, it was abnormally low.[11]

The district court concluded that these facts were sufficient to allow Ms. Reigel's outrageous conduct claim to go to the jury. We disagree.

Though there is evidence that the nurses and Ms. Cho were abrupt, irresponsible, and lacking in sensitivity in responding to Ms. Reigel's requests for help, we conclude that the evidence was not sufficient to lead "an average member of the community ... to exclaim, 'Outrageous!'" *Rugg v. McCarty,* 173 Colo. 170, 177, 476 P.2d 753, 756 (1970); Restatement (Second) of Torts § 46 cmt. d; *cf. Humana of Ky., Inc. v. Seitz,* 796 S.W.2d 1, 3–4 (Ky.1990) (where a nurse delayed in responding to the plaintiff's room, told her to "shut up" though she was distressed at having given birth to a stillborn baby, and told her that the baby would be disposed of in the hospital, her conduct was not extreme and outrageous; although the nurse's conduct was "cold, callous, and lacking sensitivity," it was not beyond all bounds of decency); *C.M. v. Tomball Reg'l Hosp.,* 961 S.W.2d 236, 244–45 (Tex.App.1997) (where the defendant treated the plaintiffs "like dirt," told them

11. Ms. Reigel also alleges that Ms. Pemkiewicz falsified the chart by suggesting that at 5:15 p.m. Mr. Reigel "was in generally good health, except for shortness of breath." Though the chart for this period notes that Mr. Reigel had "troubled breathing," it also states that multiple lab tests

had been ordered, indicates that one of the lab test results was abnormal, and notes that a doctor had ordered that Mr. Reigel be sent to the emergency room. Thus, this entry does not suggest that, aside from the shortness of breath, Mr. Reigel was in generally good health.

"[w]e do not like to deal with rape victims," suggested that the alleged victim, a minor, could have lost her virginity by riding a bike or horse, and interviewed the minor in a public waiting room, her "rude, insensitive, and uncaring" conduct was not sufficiently outrageous to present a jury question).

Similarly, the evidence that Alpine's employees did not attend closely to Mr. Reigel while his condition was deteriorating was not sufficient to create a jury question on outrageousness. The period of the alleged inattentiveness was less than two hours. Ms. Reigel introduced no evidence suggesting that the employees knew that during this time Mr. Reigel was experiencing a serious health problem that required immediate treatment. Further, Ms. Pemkiewicz had already taken Mr. Reigel's vital signs, contacted Dr. Cary, and ordered multiple lab tests in response to Mr. Reigel's allegedly worsening condition. Though she and the other employees may have failed to monitor Mr. Reigel adequately or to recognize that his symptoms required immediate treatment, reasonable persons could not conclude that this conduct rose to the level of being "atrocious[ ] and utterly intolerable in a civilized community." *Rugg*, 173 Colo. at 177, 476 P.2d at 756; *Roget v. Grand Pontiac, Inc.*, 5 P.3d 341, 345 (Colo.App.1999) ("Outrageous conduct occurs when an actor intentionally and recklessly causes severe emotional distress."); Restatement (Second) of Torts § 46; *cf. Jones v. Muskegon Cnty.*, 625 F.3d 935, 948 (6th Cir.2010) (where two prison nurses allegedly received medical packets from the inmate claiming that he was seriously ill and ignored the packets for several months because they thought he was "faking it," this deliberate indifference to his serious medical needs was not sufficiently extreme or outrageous to support the inmate's claim because it would not cause a reasonable juror to exclaim "outrageous!"); *Tater–Alexander v. Amerjan*, 2009 WL 1212977, *6–7 (E.D.Cal.2009) (unpublished memorandum decision) (where the doctor refused to treat the plaintiff with full knowledge of his medical diagnosis, the complaint sufficiently pled outrageous conduct); *Watts v. Golden Age Nursing Home*, 127 Ariz. 255, 619 P.2d 1032, 1035 (1980) (the nursing home's two-day delay in informing the plaintiff that her husband was terminally ill was unjustifiable but did not fall within the "quite narrow range of 'extreme and outrageous' conduct"); *Payton Health Care Facilities, Inc. v. Estate of Campbell*, 497 So.2d 1233, 1240 (Fla. Dist.Ct.App.1986) (where the plaintiff's expert testified that the standard of care at the deceased's health care facility was "an outrageous deviation from the acceptable standard," there was sufficient evidence to sustain the extreme and outrageous conduct verdict); *Lykins v. Miami Valley Hosp.*, 157 Ohio App.3d 291, 811 N.E.2d 124, 147–48 (2004) (where the defendants allegedly failed to diagnose a patient properly, summary judgment for the defendants was appropriate on the extreme and outrageous conduct claim though the defendants' alleged negligence was a matter for the jury).

Finally, as to Ms. Pemkiewicz's alleged falsification of Mr. Reigel's chart, we note that she allegedly did this (1) outside the presence of Mr. or Ms. Reigel, and (2) after the paramedics had arrived to transport Mr. Reigel to the hospital. There is no indication that the alleged falsification affected Mr. Reigel's care or was part of a pattern of conduct that took place over the course of that care.

Accordingly, we conclude that the evidence was insufficient to create a jury question on Ms. Reigel's outrageous conduct claim. *See Coors Brewing Co.*, 978 P.2d at 665 (where the defendant's executives allegedly engaged in an extensive criminal conspiracy and fired the plaintiff to cover up the misconduct by making him appear solely responsible therefor, the alleged conduct did not rise to the requisite high level of outrageousness as a matter of law); *City of Lafayette v. Barrack*, 847 P.2d 136, 139 (Colo.1993) ("courts are more likely to find conduct outrageous if it involves a course of conduct rather than a single incident").

We are not persuaded otherwise by *DeCicco v. Trinidad Area Health Ass'n*, 40 Colo. App. 63, 573 P.2d 559 (1977), on which Ms. Reigel relies. In *DeCicco*, a hospital administrator refused to send an ambulance to a woman who had lapsed into a coma unless

her doctor (who had recently resigned from the hospital) consented to having her sent to the administrator's hospital, not the hospital the doctor had determined was best able to treat the woman's condition. *Id.* at 64, 573 P.2d at 560–61. The administrator's hospital provided the only ambulance service in the county. *Id.,* 573 P.2d at 560. Due to its refusal to send an ambulance, the doctor had to request an ambulance from New Mexico, which resulted in a substantial delay in transporting the woman to the hospital. *Id.* at 65, 573 P.2d at 560. The woman died one hour after arriving in the hospital. *Id.* Based on these facts, the division concluded, "defendants' refusal of ambulance service to the critically ill Mrs. DeCicco on grounds irrelevant to her need for, or the availability of the service" could constitute extreme and outrageous conduct. *Id.* at 66, 573 P.2d at 562.

Here, unlike in *DeCicco,* none of Alpine's employees knew that Mr. Reigel was critically ill. The allegation is that they should have known. Nor was there evidence of a history here suggesting personal antagonism between the Reigels or their doctors and Alpine and its employees. Further, as noted, according to Ms. Reigel, Alpine's nurses refused to send Mr. Reigel to the hospital or to have a registered nurse or doctor evaluate him because they were waiting for results from lab tests that had been ordered in response to his condition. Thus, their reason for refusal was not irrelevant to that condition. Though, as noted, the nurses may have failed to monitor Mr. Reigel adequately, this conduct is not comparable to the deliberate indifference to the patient's known condition in *DeCicco.*

Therefore, we conclude that the district court erred in denying Alpine's motion for directed verdict on Ms. Reigel's outrageous conduct claim.

### D. Plaintiffs May Seek Punitive Damages on Remand

Defendants contend that the district court erred in allowing Ms. Reigel to recover punitive damages on her negligence and outrageous conduct claims because (1) the court abused its discretion in permitting Ms. Reigel to amend her complaint to request punitive damages shortly before trial; (2) the court erred in denying defendants' motion for directed verdicts based on Ms. Reigel's failure to establish that any managerial employee committed the wrongful acts at issue; and (3) punitive damages are not awardable on an outrageous conduct claim. We need not address the second contention because we cannot anticipate the nature of the evidence that may be presented on remand. And we need not address the third contention because we have determined that Alpine was entitled to a directed verdict on the outrageous conduct claim. We address the first contention only as it pertains to Alpine.

### 1. Standard of Review

We review a district court's decision on a motion to amend a complaint for an abuse of discretion. *Cody Park Prop. Owners' Ass'n, Inc. v. Harder,* 251 P.3d 1, 5 (Colo.App.2009); *DeHerrera v. Am. Family Mut. Ins. Co.,* 219 P.3d 346, 353 (Colo.App. 2009). A court abuses its discretion where its decision is manifestly arbitrary, unreasonable, or unfair. *Cody Park Prop. Owners' Ass'n,* 251 P.3d at 5.

### 2. The District Court Did Not Abuse Its Discretion in Allowing Ms. Reigel to Amend the Complaint

Under C.R.C.P. 16(b)(8), a party has "120 days after the case is at issue [to move] to amend [the] pleadings." However, section 13–64–302.5(3), C.R.S.2011, provides:

> In any civil action or arbitration proceeding alleging negligence against a health care professional, exemplary damages may not be included in any initial claim for relief. A claim for such exemplary damages may be asserted by amendment to the pleadings only after the substantial completion of discovery and only after the plaintiff establishes prima facie proof of a triable issue. If the court or arbitrator allows such an amendment to the complaint under this subsection (3), it may also, in its discretion, permit additional discovery on the question of exemplary damages.

The Reigels filed their initial complaint on January 23, 2007. The case became at issue on October 17, 2008, and the trial was scheduled to begin on January 19, 2010.

Discovery began in early 2009. Between September and December 2009, the Reigels moved three times to compel discovery related to defendants' relationships to one another and defendants' individual awareness of and ability to respond to the alleged treatment deficiencies at Alpine. The district court granted these motions. It also found that defendants had abused the discovery process and awarded the Reigels their attorney fees for one of the motions. Defendants provided the last of their discovery responses in December 2009.

In the meantime, on November 13, 2009, the Reigels moved to amend their complaint to request punitive damages based on Alpine's history of treatment deficiencies, as reflected in surveys on Medicare.gov.[12] Defendants opposed the motion, arguing in relevant part that it was untimely because the surveys had occurred between 2005 and 2007 and were therefore available to the Reigels long before they moved to amend. The court granted the motion without explanation.

Thereafter, defendants moved to continue the trial date to allow them to conduct discovery and prepare motions related to the punitive damages request. The court denied the motion, again without explanation.

We first note that although the court did not make any express findings in granting the Reigels' motion, we can discern the basis for its decision from the parties' briefs in the district court. Therefore, the omission does not require reversal. *See Great Neck Plaza, L.P. v. Le Peep Rests., LLC,* 37 P.3d 485, 489 (Colo.App.2001); *Foster v. Phillips,* 6 P.3d 791, 796 (Colo.App.1999); *Ross v. Denver Dep't of Health & Hosps.,* 883 P.2d 516, 519 (Colo.App.1994).

We reject defendants' suggestion that the Reigels were bound by the time limitation in C.R.C.P. 16(b)(8), rather than that in section 13–64–302.5(3). The Colorado Rules of Civil Procedure do not apply to the extent they are " 'inconsistent or in conflict with the procedure and practice provided by the applicable statute.' " *City of Steamboat Springs v. Johnson,* 252 P.3d 1142, 1145 (Colo.App.2010) (quoting C.R.C.P. 81(a)); *see Hernandez v. Downing,* 154 P.3d 1068, 1071 (Colo.2007); *cf.* C.R.C.P. 15(a) ("[A] party may amend his pleading only by leave of court . . . and leave shall be freely given when justice so requires.").

Further, we are not persuaded by Alpine's argument that the surveys were publicly available. Regardless of when the surveys were available, the Reigels had to discover to whom the surveyed deficiencies could be attributed. Even after the Reigels filed their motion, defendants were providing discovery relating to which of them knew about and could respond to Alpine's deficiencies. Accordingly, we conclude that the Reigels properly moved to amend their complaint "after the substantial completion of discovery and . . . after . . . establish[ing] prima facie proof of a triable issue." § 13–64–302.5(3); *see also Polk v. Denver Dist. Court,* 849 P.2d 23, 27 (Colo.1993) (when a moving party knows of the claim and whether the moving party states an acceptable reason for the delay are important factors in determining whether to allow an amended complaint).

Finally, we reject Alpine's contention that the district court abused its discretion in allowing the amended complaint because it later denied defendants' motion for a continuance. Though section 13–64–302.5(3) allows the court to "in its discretion, permit additional discovery on the question of exemplary damages," it does not require the court to permit such discovery or to continue the trial at the defendant's request.

12. Those deficiencies were, as relevant here, that Alpine (1) had hired employees without checking whether they had histories of abusing or neglecting residents; (2) did not have the necessary policies or infrastructure to prevent mistreatment and neglect of its residents; (3) had failed to provide adequate quality of care to numerous residents; (4) was not creating adequate care plans to instruct Alpine's employees how to care for particular residents; (5) had failed to properly medicate its residents; (6) had employed at least one nurse who did not follow the doctor's orders in regard to a lab test; and (7) was not keeping accurate and appropriate medical records.

Consequently, we conclude that the district court did not abuse its discretion in granting the Reigels' motion to amend their complaint to request punitive damages.

### E. Medicare.gov Evidence

Before trial, defendants filed a motion in limine to exclude the Medicare.gov evidence. The Reigels responded that the evidence was admissible solely in relation to their Colorado Consumer Protection Act (CCPA) claim. The district court ruled that the evidence was admissible.

The Reigels dismissed the CCPA claim before trial. Nevertheless, at trial, the Reigels sought to introduce some of the evidence. Defendants objected that the evidence was hearsay, unreliable, and unduly prejudicial. The court overruled the objection, saying that it "ha[d] ruled on this issue previously." No one mentioned that the Reigels had formerly sought to admit the evidence solely for their CCPA claim.

From this record, we cannot ascertain whether the district court believed the evidence was relevant as to claims other than the CCPA claim. Consequently, on remand, if plaintiffs attempt to introduce this evidence, the court should determine whether it is admissible in relation to their negligence claim against Alpine.

### III. The Sons' Cross–Appeal

The sons cross-appeal the district court's directed verdict in defendants' favor on the wrongful death claim, and its award of costs to defendants for that claim. They contend, relying on *Steedle v. Sereff,* 167 P.3d 135 (Colo.2007), that because Ms. Reigel introduced evidence that she suffered noneconomic damages, the district court erroneously concluded that they were also required to prove personal damages.[13] We agree that reversal of these decisions is required.

The sons' contention requires us to interpret certain provisions of the Wrongful Death Act, §§ 13–21–201 to –204, C.R.S.2011. The question we must resolve is whether, when multiple plaintiffs bring a wrongful death action based on a decedent's death and the plaintiffs only seek damages for noneconomic losses, each plaintiff must establish that he personally suffered damages for noneconomic losses to remain a party to the action. We answer that question in the negative.

### A. Standard of Review

Because the sons' contention presents an issue of statutory construction, our review is de novo. *Foiles v. Whittman,* 233 P.3d 697, 699 (Colo.2010).

### B. The Sons May Participate in the Action as Plaintiffs

■ In interpreting a statute, our goal is to give effect to the General Assembly's purposes by adopting an interpretation that best effectuates those purposes. *Smith v. Exec. Custom Homes, Inc.,* 230 P.3d 1186, 1189 (Colo.2010). To do so, "we look first to the plain language of the statute, giving the language its commonly accepted and understood meaning." *Id.* (citation omitted). Where, as here, the statute exists as part of a comprehensive statutory scheme, we must read the scheme as a whole so that we may give consistent, harmonious, and sensible effect to all of its parts. *Union Pacific R.R. Co. v. Martin,* 209 P.3d 185, 189 (Colo.2009); *Frank M. Hall & Co., Inc. v. Newsom,* 125 P.3d 444, 448 (Colo.2005). Where the statutory language is clear and unambiguous, we enforce it as written and do not resort to other rules of statutory construction. *Smith,* 230 P.3d at 1189.

Sections 13–21–201 and –202, C.R.S.2011, of the Wrongful Death Act authorize a decedent's surviving spouse and heirs to seek damages if the decedent's death was caused by negligence. The surviving spouse and heirs can bring only one wrongful death action, § 13–21–203(1)(a), C.R.S.2011, and they own the judgment obtained in that action "under the statutes of descent and distribution," § 13–21–201(2), C.R.S.2011.

---

**13.** The sons contend in their reply brief that the district court also erred by finding that they did not present evidence of personal damages. We do not address issues raised for the first time in a reply brief. *See Arnold v. Anton Coop. Ass'n,* 293 P.3d 99, 106 (Colo.App.2011).

**996**

Regarding the damages the heirs may recover, section 13–21–203(1)(a) provides, in relevant part:

in every [wrongful death] action the jury may give such damages as they may deem fair and just, with reference to the necessary injury resulting from such death, including damages for noneconomic loss or injury ... and including within noneconomic loss or injury damages for grief, loss of companionship, pain and suffering, and emotional stress, to the surviving parties who may be entitled to sue....

Section 13–21–102.5(2)(b), C.R.S.2011, defines noneconomic loss or injury as "nonpecuniary harm for which damages are recoverable by the person suffering the direct or primary loss or injury, including pain and suffering, inconvenience, emotional stress, and impairment of the quality of life."

In *Steedle*, the supreme court considered whether the $150,000 statutory damages cap in the Colorado Governmental Immunity Act applied separately to each family member who was a plaintiff on a wrongful death claim. 167 P.3d at 136. In concluding that it did not, the court noted that under the Wrongful Death Act, "the right of the heirs to collect damages ... does not arise from a separate tort, but instead is wholly derivative of the injury to the decedent." *Id.* at 140. Thus, the court reasoned, "[w]hether an individual heir suffers actual damages is irrelevant; unlike a loss of consortium claim that requires proof of personal damages, a wrongful death action involves a shared injury among survivors such that there is no individualized recovery of damages." *Id.*

Though it is true that different heirs may suffer different noneconomic losses as a result of a decedent's death, we are not persuaded that this requires each heir-plaintiff to prove noneconomic losses. Whether damages are awarded for economic or noneconomic losses, all damages awarded are owned jointly and distributed through the statutes of descent and distribution. *See* § 13–21–201(2); *Steedle*, 167 P.3d at 140. As applied here, that means that whatever noneconomic damages Ms. Reigel established were owned by the sons as well.

It follows that the district court erred in dismissing the sons from the case. And because the award of costs against the sons was premised on that dismissal, it further follows that the award cannot stand. On remand, the sons will be entitled to participate as plaintiffs on the negligence claim.

The judgment against SSC and Administrative Services is reversed. The judgment against Alpine is reversed as to the outrageous conduct claim and vacated as to the negligence claim. The judgment and associated order awarding costs against the sons are reversed. The case is remanded for a new trial on plaintiffs' negligence claim against Alpine.

Judge CARPARELLI and Judge FURMAN concur.