The **BANKRUPTCY ESTATE OF Dan MORRIS, M.D., by and through Lynn Goodwin, successor in interest, and Lynn Goodwin individually, as successor in interest to the Bankruptcy Estate of Dan Morris, M.D., Plaintiffs–Appellants,**

v.

**COPIC INSURANCE COMPANY, Inc., a Colorado corporation, Defendant–Appellee.**

Nos. 06CA2588, 07CA0305.

Colorado Court of Appeals, Div. III.

July 10, 2008.

520

The Mahoney Law Firm, P.C., Paul M. Mahoney, Kevin S. Mahoney, Denver, Colorado, for Plaintiffs–Appellants.

Pryor Johnson Carney Karr Nixon, P.C., Peter W. Pryor, Elizabeth C. Moran, Michael S. Drew, Greenwood Village, Colorado, for Defendant–Appellee.

Opinion by Judge CASEBOLT.

In this insurance bad faith proceeding, plaintiffs, the Bankruptcy Estate of Dan Morris, M.D., and the successor-in-interest, Lynn Goodwin, appeal the summary judgment in favor of defendant, COPIC Insurance Company, Inc. We affirm in part, reverse in part, and remand.

## I. Background

The following facts are undisputed. This case arises from an underlying medical malpractice action (underlying case) in which Jack Duksin sued Dan Morris, M.D., asserting that Morris provided substandard care in reviewing Duksin's chest x-rays and in instructing him about follow-up care for a lesion on his left lung that later proved to be lung cancer. Morris was insured by COPIC, which provided his defense in the underlying case and liability coverage for him in the sum of $1 million. Following Duksin's death, Goodwin, his spouse, became the plaintiff and pursued a claim for wrongful death.

In the underlying case, Morris received a demand letter from Duksin's attorneys at the time he was served with the complaint, offering to settle the claim for $1 million, and indicating that, if the demand was not accepted, the case would proceed to trial with no bargaining and no negotiations. The COPIC policy insuring Morris provided, in pertinent part, that COPIC had "the right to make such investigation and settlement of any claim or suit as we deem appropriate." However, the policy also contained a clause stating:

> While we will seek your consent before settling any claim brought against you, if you and we cannot agree on whether a claim or suit should be settled, either you or we may request that the dispute be submitted to arbitration. You and we shall each select an arbiter and they shall select a third arbiter. By majority vote of the arbiters, their decision shall be final and binding on you and us.

Morris maintained that his care of Duksin was appropriate. He declined to settle the underlying case, even though one of Goodwin's experts had opined that the economic losses alone exceeded $3 million. Following discovery, COPIC submitted the details of the case to its claims committee, which unanimously determined not to settle the matter.

The underlying case went to trial. During deliberations, the jury requested a calculator. This prompted COPIC to recommend settlement to Morris and, after securing Morris's consent, to offer the sum of $350,000. Goodwin declined the offer and made no counter-offer. The jury later returned a verdict well in excess of the COPIC limits.

While post-trial motions were pending and before judgment entered, COPIC paid its policy limits of $1 million into the registry of the court. The attorneys hired by COPIC to represent Morris sought additional authority to settle the case before the court entered judgment because an issue existed as to the amount of prejudgment interest that could be awarded and whether it was limited by statute. However, COPIC declined to make fur-

ther offers at that time. The court entered judgment in the principal sum of $1,907,480, plus prejudgment interest of $403,669.27.

Shortly thereafter, COPIC told Goodwin's counsel that it would be willing to pay, in addition to the $1 million, the total accrued interest of $560,695. Goodwin did not respond. COPIC then offered an additional $1 million over and above the policy limits already paid into the court registry to settle all claims against Morris and any potential claims against COPIC. The offer would not have satisfied the entire judgment. Goodwin rejected the offer and did not make a counteroffer.

After Goodwin started collection efforts, Morris filed for bankruptcy. Over Morris's objection and despite his assertion that he did not believe COPIC had acted in bad faith, the bankruptcy court assigned to Goodwin any claims Morris had against COPIC. Goodwin then initiated this action, asserting claims of bad faith, negligence, breach of contract, civil conspiracy, and violation of the Colorado Consumer Protection Act, sections 6–1–101 to –1120, C.R.S.2007 (CCPA).

The trial court granted COPIC's motion for summary judgment on the CCPA claim, concluding that Goodwin had failed to demonstrate any evidence of public impact on actual or potential consumers. The court later granted summary judgment in favor of COPIC on the remaining claims. This appeal followed.

## II. Bad Faith Claim

Goodwin contends that the trial court erred in granting summary judgment on her claim for bad faith because there are genuine issues of material fact. We agree.

### A. Standard of Review

We review a summary judgment de novo. *Aspen Wilderness Workshop, Inc. v. Colo. Water Conservation Bd.*, 901 P.2d 1251, 1256 (Colo.1995).

Summary judgment is a drastic remedy and is warranted only upon a clear showing that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. A fact is material if it will affect the outcome of the case. *Dominguez Reservoir Corp. v. Feil*, 854 P.2d 791, 795 (Colo.1993); *White v. Farmers Ins. Exch.*, 946 P.2d 598, 599 (Colo. App.1997).

The burden is on the party moving for summary judgment to establish the lack of a genuine issue of fact. Any doubts in this regard must be resolved against the moving party. *Aspen Wilderness Workshop*, 901 P.2d at 1256.

We view all evidence properly before the trial court in the light most favorable to the nonmoving party and give the nonmoving party the benefit of all favorable inferences that may be drawn from the facts. *Luttgen v. Fischer*, 107 P.3d 1152, 1155 (Colo.App. 2005).

### B. Bad Faith Law

For an insured to prevail on a bad faith claim against an insurer, the insured must establish the insurer acted unreasonably, causing damages to the insured. *Farmers Group, Inc. v. Trimble*, 691 P.2d 1138, 1142 (Colo.1984). The determination of whether an insurer has breached its duties to an insured is one of reasonableness under the circumstances. *Surdyka v. DeWitt*, 784 P.2d 819, 822 (Colo.App.1989). In other words, the question is whether a reasonable insurer under the circumstances would have denied or delayed payment of the claim. *See* § 10–3–1113, C.R.S.2007; *Trimble*, 691 P.2d at 1142; *Pham v. State Farm Mut. Auto. Ins. Co.*, 70 P.3d 567, 572 (Colo.App.2003).

Third-party bad faith occurs when an insurance company acts unreasonably in investigating, defending, or settling a claim brought by a third person against its insured under a liability policy. *Farmers Group, Inc. v. Williams*, 805 P.2d 419, 421 (Colo. 1991). In the third-party context, an insurance company stands in a position of trust with regard to its insured; a quasi-fiduciary relationship exists between the insurer and the insured. *Goodson v. Am. Standard Ins. Co.*, 89 P.3d 409, 414 (Colo.2004).

The duty of good faith continues as long as the insurer-insured relationship ex-

ists. *Bucholtz v. Safeco Ins. Co.,* 773 P.2d 590, 592 (Colo.App.1988). Thus, the tort of bad faith breach of an insurance contract encompasses all of the dealings between the parties, including conduct occurring before, during, and after trial. *See Dale v. Guar. Nat'l Ins. Co.,* 948 P.2d 545, 552 (Colo.1997).

The reasonableness of the insurer's conduct must be determined objectively, based on proof of industry standards. *Travelers Ins. Co. v. Savio,* 706 P.2d 1258, 1274 (Colo.1985). The aid of expert witnesses is often required to establish such standards. *Goodson,* 89 P.3d at 415.

When conflicting evidence exists, what constitutes reasonableness under the circumstances is ordinarily a question of fact for the jury. *See Rine v. Isham,* 152 Colo. 411, 416, 382 P.2d 535, 537 (1963); *Scoular Co. v. Denney,* 151 P.3d 615, 620 (Colo.App. 2006); *see also Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.,* 90 Cal.App.4th 335, 346, 108 Cal.Rptr.2d 776, 784 (2001)(insurer's bad faith is ordinarily a question of fact to be determined by a jury). However, in appropriate circumstances, as when there are no genuine issues of material fact, reasonableness may be decided as a matter of law. *See Lego v. Schmidt,* 805 P.2d 1119, 1124 (Colo.App.1990)(determining as a matter of law that no proximate causation existed); *Chateau Chamberay,* 90 Cal. App.4th at 350, 108 Cal.Rptr.2d at 787 (the question becomes one of law where there is no dispute about underlying facts and, due to an absence of conflicting inferences, reasonable minds could not differ).

## C. Application

The parties concur that there are three relatively discrete periods upon which the claims and conduct at issue should focus: pretrial, during trial, and post-trial. We will analyze the claims in the same way.

We conclude that, viewing the evidence in the light most favorable to Goodwin and giving her the benefit of all favorable inferences, there are, at the minimum, disputed issues of material fact as to whether COPIC and the attorneys it retained to defend the underlying case properly advised Morris as to the risks of trial, the risks of an excess verdict, the right to retain personal counsel, the availability of alternative dispute resolution, and the alternative of settling the case. The following evidence proffered by Goodwin is supported by documents, depositions, affidavits, and the record.

### 1. Pretrial Conduct

COPIC knew that the claim against Morris presented a risk of an excess judgment. The attorney retained by COPIC to represent Morris admits he owed a duty to recommend that Morris obtain personal counsel before trial to represent him regarding a potential excess judgment. While that attorney claims that he did so, Morris and his wife testified that the attorney did not recommend personal counsel. Instead, Morris stated he was informed that he had the option to hire personal counsel. There is, therefore a genuine issue of fact whether a recommendation was made.

Concerning materiality of this disputed issue, the difference between "recommending" personal counsel to an insured and "advising" the insured about "an option" to retain personal counsel is material because it may bear upon the reasonableness of COPIC's conduct. *See Christian Builders, Inc. v. Cincinnati Ins. Co.,* 501 F.Supp.2d 1224 (D.Minn.2007) (in affirming summary judgment for insurer on bad faith action involving an excess judgment, court noted that insurance carrier told insured of the potential for a verdict in excess of policy limits, of the insured's responsibility for any excess, and of insured's right to retain personal counsel; after unsuccessful mediation of underlying case, defense counsel hired by insurer recommended that insured retain personal counsel); *see also* Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 30.21, at 338 (2008)("Although defense counsel can and should evaluate and advise regarding the reasonableness of the settlement demand, counsel should not choose sides and advocate either client's [insurance company or insured] interest as between them. Avoiding that conflict [of interest] means that the insured should consider the assistance of another lawyer. That lawyer can counsel the insured concerning whether

to risk the excess exposure *and should function as an advocate against the insurer."* (emphasis supplied) ); *cf. Hartford Accident & Indem. Co. v. Foster,* 528 So.2d 255, 273 (Miss.1988)(when a settlement offer within limits is made, if there is any objective reason for the insured to have additional legal counseling, defense counsel should promptly advise him to seek it; any doubt on this question should be resolved in favor of recommending independent advice).

The initial demand letter served with the complaint indicated that if Morris and COPIC did not pay $1 million within thirty days, the case would proceed to trial with "no bargaining" and "no negotiations." However, there is evidence that Goodwin's position on settlement negotiations changed. Neither COPIC nor defense counsel sent Morris copies of letters from Goodwin concerning alternative dispute resolution inquiries, although he was told about the letters. When Morris reviewed, in his bankruptcy proceedings, the letters Goodwin's counsel had sent to defense counsel, he testified that he interpreted them to express a willingness to open negotiations and as an attempt to do so. Morris was not told, however, that Goodwin might be willing to negotiate.

An expert witness for COPIC opined in the bankruptcy proceedings that, before the underlying case proceeded to trial, there was a probability of a plaintiff's verdict. Another expert for COPIC opined that the probability of a plaintiff's verdict in the underlying case was as high as sixty to seventy percent. One of Goodwin's experts opined that COPIC knew or should have known that the case against Morris should be settled before trial to protect him from the danger of an excess verdict. COPIC's claims committee, however, voted unanimously to defend the case through trial, rather than attempt any kind of settlement, and Morris believed that his chances of winning a defense verdict were as high as eighty to ninety percent.

These opposing views on the value and validity of the underlying case create an issue of fact whether COPIC's evaluation of the case was reasonable and whether it should have recommended to Morris that settlement ought to be pursued. Indeed, both Morris and his wife testified that, if the COPIC claims committee had voted to attempt settlement before trial, they would have agreed to settle. Moreover, there is evidence that COPIC, not the insured, makes the ultimate decision about whether to pursue settlement or defend the case at trial. And the insurance policy gives that right to COPIC, even though that right is tempered by the consent clause. In addition, one of COPIC's experts conceded that the insurance policy does not explicitly require consent.

Even if Morris had declined to give his consent to settlement, the policy contains an arbitration provision concerning consent. One of Goodwin's experts opined that a reasonable insurer, having determined that settlement should be pursued, would have obtained Morris's consent and that, if consent were not forthcoming, COPIC should have pursued the arbitration procedure. *See Schlossberg v. Epstein,* 73 Md.App. 415, 433, 534 A.2d 1003, 1013 (1988) (to preclude insured from maintaining an action against his insurer for bad faith refusal to settle, the evidence must demonstrate that the insured's decision not to settle was a fully informed decision, requiring that the insured be given all the information necessary to make such a decision); *see also Miller v. Byrne,* 916 P.2d 566, 575–76 (Colo.App.1995)(there must be disclosure of all facts, circumstances, and consequences that are necessary to enable the insured to make an informed decision about a settlement offer).

Relying on *Eklund v. Safeco Insurance Co.,* 41 Colo.App. 96, 579 P.2d 1185 (1978), upon which the trial court primarily based its summary judgment ruling, COPIC contends that the undisputed facts show that Morris did not want to settle the case, that defense counsel and COPIC, after thorough review, supported Morris's desire to try the case, and that it is not bad faith for an insurer to honor the insured's decision not to settle. We conclude that *Eklund* is inapposite here.

In *Eklund,* a trustee in bankruptcy of an insured sued an automobile insurer for bad faith for failing to settle a claim within policy limits. It was undisputed that the insured had instructed the insurer not to settle the case even though settlement demands were

within policy limits. Noting that the bankruptcy trustee stood in the same position as the insured, the court concluded that the trustee could not hold the insurer liable because of the insured's direction not to settle the claim upon any terms.

However, it is notable that, in response to the insurance company's motion for summary judgment in *Eklund,* the trustee submitted no counter affidavits or depositions, but merely argued that there were issues of fact. Here, in contrast, there are multiple counter affidavits, depositions, and proffered opinions of experts that, in our view, create issues of fact as to whether Morris was adequately informed of the likelihood of a plaintiff's verdict if the case were to go to trial, the risk of an excess verdict, the need to retain personal counsel, the availability of alternative dispute resolution, and the possibility of settling the case.

Further, in *Eklund* it appears that the insured conducted and relied upon his own investigation of the accident before directing the insurer not to settle, whereas here, there is evidence that Morris relied upon COPIC and defense counsel who, if Goodwin's evidence is to be credited, may have misevaluated the case. In addition, Morris specifically testified that if COPIC had recommended that he settle, he would have given his consent to settlement. Thus, *Eklund* is distinguishable on the facts. *See Schlossberg,* 73 Md.App. at 433, 534 A.2d at 1012 (noting that in *Eklund* the insured was fully and adequately informed).

For similar reasons, COPIC's reliance on *Peterson v. American Family Mutual Insurance Co.,* 280 Minn. 482, 160 N.W.2d 541 (1968), is also misplaced. In that case, the court upheld a summary judgment determining that the insurer was not liable for bad faith where the insured insisted on going to trial on the ground that he was not to blame for an automobile accident. However, the court specifically noted that no countervailing evidence was presented to the trial court to contradict the insured's assertion and also noted that there was no adequate showing that the insured was laboring under a misapprehension of the facts. Here, in contrast,

there is some evidence that Morris may have been ill-informed.

■ Both COPIC and the trial court also relied upon the "consent to settle" clause contained in the insurance policy. However, that clause does not preclude the bad faith claim as a matter of law for several reasons.

■ First, the policy itself provides that COPIC has "the right to make such investigation and settlement of any claim or suit, as we deem appropriate," indicating that COPIC reserved to itself the ultimate determination whether settlement ought to be pursued. Retention of that right is part of the reason that Colorado law imposes the duty of good faith and fair dealing on insurers; COPIC thereby becomes a quasi-fiduciary. *See Trimble,* 691 P.2d at 1141–42.

Second, even the "consent to settle" clause does not give an unqualified right to Morris to veto settlement. It simply provides that COPIC "will seek your consent before settling any claim brought against you," and that, "if you and we cannot agree on whether a claim or suit should be settled, either you or we may request that the dispute be submitted to arbitration." If a reasonable insurer would have recommended settlement under the circumstances of the underlying case, but Morris still refused to consent (which is not likely given his testimony), COPIC had the right to take the consent issue to binding arbitration.

In addition, even if *Eklund* or the "consent to settle" clause would operate to preclude a bad faith claim because of lack of Morris's consent, preclusion would apply only to COPIC's pretrial conduct, because Morris consented to a settlement during trial. Neither *Eklund* nor the consent to settle clause would preclude a bad faith claim concerning whether COPIC's conduct in then evaluating the underlying case and making a settlement offer of $350,000 was reasonable, as we discuss below.

To the extent that COPIC argues that there is evidence that Morris was fully informed of the evidence against him, the risks of trial, and the risks of an excess verdict before trial, we agree. However, the existence of such evidence does not, by itself,

validate the summary judgment. Instead, it simply reinforces our conclusion that there are genuine issues of material fact. For similar reasons, we conclude that evidence indicating significant flaws in the plaintiff's underlying case does not preclude the existence of issues of material fact.

Contrary to COPIC's further contentions, the opinions of Goodwin's bad faith experts are not merely conclusory. Instead, they are predicated in large part upon the deposition and bankruptcy hearing testimony of the parties and their experts in the underlying case.

Accordingly, we discern genuine issues of material fact concerning COPIC's pretrial conduct that preclude summary judgment.

### 2. Conduct During Trial

After the jury began deliberations, it sent questions to the trial court inquiring about Duksin's children and whether the jury could decide to whom any money would be awarded. It then requested a calculator. At that point, Morris consented to settle. COPIC then made an offer of $350,000. Goodwin rejected the offer, indicating she would await the verdict.

One of Goodwin's bad faith experts opined that $350,000 was not a reasonable offer because, at that point, there was a substantial danger that the verdict would be in excess of policy limits. The expert opined that the offer was unreasonably low, that there was no time for COPIC to be "testing the waters" on the theory that this would elicit a counteroffer from Goodwin, and that COPIC should have offered its policy limits at that time. This expert opined, and another of Goodwin's bad faith experts also opined, that COPIC's refusal to do so was unreasonable and indicated it was favoring its own interests above those of Morris.

Concerning Goodwin's rejection of the offer and her failure to respond with a counteroffer, one of Goodwin's experts opined that this did not excuse COPIC's failure to settle. More important, Goodwin submitted an affidavit in response to the motion for summary judgment stating that, if COPIC had offered $1 million before the verdict was returned, she would have accepted it.

Accordingly, we discern genuine issues of material fact concerning whether COPIC's conduct during trial was unreasonable.

### 3. Post–Trial Conduct

Judgment was not entered until over ten months after the verdict. Before entry of judgment, defense counsel wrote to COPIC, suggesting that the uncertainty surrounding whether prejudgment interest could exceed the statutory economic damages cap provided an opportunity to settle the case. Counsel did not send Morris a copy of the letter. COPIC did not communicate with Morris during that period, nor did it attempt to negotiate during that period.

After judgment was entered, COPIC determined that it was willing to pay the entire judgment, plus interest, if necessary. However, COPIC offered only an additional $1 million above its $1 million policy limit, which would leave more than $500,000 of the judgment unsatisfied, and conditioned payment of that sum not only upon release of Morris's liability to Goodwin, but also release of any liability that COPIC may have had. One of Goodwin's experts opined that such conduct was indicative of COPIC's knowledge that it may not have acted reasonably in handling the claim against Morris. In addition, COPIC never offered to pay or in fact paid the entire amount of the judgment, plus interest, as it had decided it was willing to do.

Goodwin testified that she did not accept either of COPIC's two offers to compromise her judgment because she felt that only when a judgment is paid in full would the case be over. Both of Goodwin's bad faith experts opined that COPIC's conduct post-trial was unreasonable.

Hence, we perceive genuine issues of material fact whether COPIC's actions in the post-trial stage were reasonable. We therefore conclude that the trial court erred in granting summary judgment on the bad faith claim.

## III. Additional Claims

### A. Breach of Contract and Civil Conspiracy

The trial court viewed these claims as being derivative of the bad faith claim and accordingly dismissed them for that reason. Likewise, the parties have not argued on appeal that these claims involve different operative facts. In light of our determination above, we conclude that Goodwin's additional claims for breach of contract and civil conspiracy must be reinstated. However, this does not preclude the trial court from entertaining any future motions directed specifically to these claims.

### B. Negligence

In *Trimble*, 691 P.2d at 1142–43, the supreme court stated that the assertion of separate and distinct claims for bad faith and negligence is inappropriate in light of the reasonableness test for bad faith. For that reason, and because Goodwin has not argued that her negligence claim can otherwise independently stand, we uphold the dismissal of that claim.

### C. CCPA

We also uphold summary judgment dismissing Goodwin's claim under the CCPA.

To prove a claim under the CCPA, a plaintiff must show that a defendant has engaged in a deceptive trade practice; the challenged practice occurred in the course of the defendant's business; the practice significantly impacts the public as actual consumers of the defendant's services; the plaintiff suffered injury in fact to a protected interest; and the challenged practice caused the plaintiff's injury. *Hall v. Walter*, 969 P.2d 224, 234–35 (Colo.1998).

The trial court concluded that Goodwin had failed to satisfy the public impact requirement of the CCPA. Accordingly, we first examine that determination.

"Public impact" is determined based on the number of consumers directly affected by the challenged practice, the relative sophistication and bargaining power of the consumers affected, and evidence that the prac-tice has previously impacted other consumers or has the significant potential to do so in the future. *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 149 (Colo.2003).

Here, the challenged practice is COPIC's alleged unreasonable conduct in handling the underlying case. However, as is clear from review of the facts noted above, the allegations are all based on conduct that is unique to the particular transaction between Morris and COPIC. Goodwin has asserted that COPIC violated its duty of good faith and fair dealing because it ignored the particular facts and circumstances of the case and failed to protect Morris by settling the underlying case. COPIC's alleged conduct was directed only toward Morris and did not impact any other actual or potential consumers of COPIC's services and products.

We reject Goodwin's assertion that a claim for bad faith, by its very nature, involves a public impact. *See Brodeur v. Am. Home Assurance Co.*, 169 P.3d 139, 155 (Colo.2007)(the public nature of a workers' compensation insurance program is not sufficient to constitute per se public impact under the CCPA). We do not perceive that *Brodeur* would allow a different conclusion here.

We also reject Goodwin's assertion that the affidavit from her expert creates a genuine issue of material fact. The expert does not explain how COPIC's asserted policy of taking defensible cases to trial is a deceptive practice, or how that practice has a profound public impact, and there is no discussion of the number of consumers who have been or might be affected by the alleged practice.

Contrary to Goodwin's further contention, the record is clear that the trial court properly treated COPIC's motion as one for summary judgment, and not as a motion to dismiss. The motion was filed under C.R.C.P. 56 and the court considered materials outside the pleadings tendered by both parties. In addition, Goodwin did not request additional time under C.R.C.P. 56(f) to obtain additional discovery or information to rebut the motion.

And finally, we do not perceive that the court improperly shifted the burden to Goodwin to prove a prima facie case during the discovery phase of the case.

Because Goodwin cannot prove a genuine issue of material fact concerning the public impact requirement, we need not address the remaining elements of a CCPA claim.

That part of the summary judgment dismissing Goodwin's claims for negligence and violation of the CCPA is affirmed. The balance of the judgment is reversed, and the case is remanded for further proceedings.

Judge J. JONES and Judge STERNBERG * concur.

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2007.