The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
April 18, 2019

2019COA54

**Nos. 17CA0044 & 17CA0677, *Lorenzen v. Pinnacol Assurance* — Labor and Industry — Workers' Compensation; Insurance; Torts — Bad Faith Breach of Insurance Contract; Evidence — Testimony by Experts**

In this bad faith breach of insurance contract case, plaintiff sued his employer's workers' compensation insurer, alleging that the insurer's thirteen-day delay in authorizing surgery caused his permanent impairment.

The plaintiff's proffered experts relied on a theory that prolonged nerve compression from a herniated disc leads to nerve damage and, therefore, surgery must be performed sooner rather than later. The district court disallowed the testimony. It concluded that the experts' theory was not a scientifically reliable theory of medical causation and that the experts' testimony would require the jury to speculate as to whether the delay caused the

plaintiff's impairment. Then, because the plaintiff could not prove his claim without expert evidence, the district court entered judgment in favor of the insurer.

The division concludes that the district court did not abuse its discretion in disallowing the expert testimony. First, the division determines that the plaintiff had the burden to prove that but for the thirteen-day delay, he would not have suffered a permanent impairment. Second, the division concludes that the experts' theory of causation did not satisfy CRE 702, because the testimony did not reliably connect the premise that nerve compression should be alleviated by prompt surgery and the conclusion that it is more likely than not that the thirteen-day delay in undergoing surgery caused the plaintiff's permanent impairment.

COLORADO COURT OF APPEALS 2019COA54

Court of Appeals Nos. 17CA0044 & 17CA0677
City and County of Denver District Court No. 15CV32703
Honorable Michael A. Martinez, Judge

Richard Lorenzen,

Plaintiff-Appellant,

v.

Pinnacol Assurance,

Defendant-Appellee.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE HARRIS
Taubman and Rothenberg*, JJ., concur

Announced April 18, 2019

Bisset Law Firm, Jennifer E. Bisset, Denver, Colorado, for Plaintiff-Appellant

Vaughan & DeMuro, David R. DeMuro, Richard K. Rediger, Denver, Colorado, for Defendant-Appellee

The Gold Law Firm, LLC, Michael J. Rosenberg, Greenwood Village, Colorado, for Amicus Curiae Colorado Trial Lawyers Association

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2018.

¶ 1     In this bad faith breach of an insurance contract case, plaintiff, Richard Lorenzen, sued defendant, Pinnacol Assurance, his employer's workers' compensation insurer, after Pinnacol initially denied his request for surgery to treat a work-related injury.  Pinnacol's denial resulted in a thirteen-day delay between the date of the request and the date Lorenzen underwent surgery.

¶ 2     Before trial, Lorenzen disclosed four doctors as experts who intended to opine that the delay in approving the request caused Lorenzen to suffer permanent nerve damage.  The experts relied on a theory that prolonged nerve compression from a herniated disc leads to nerve damage and, therefore, surgery must be performed sooner rather than later.  As one of the doctors explained the theory, "timing matters."

¶ 3     The district court concluded that the theory relied on by the doctors — for patients with a disc herniation causing neurological deficits, prompt surgery is preferable to delayed surgery to preserve nerve function — was not a scientifically reliable theory of medical causation and disallowed the expert testimony.  Without his experts' testimony, Lorenzen could not prove causation or damages,

1

and so the district court granted summary judgment in favor of Pinnacol.[1]

¶ 4     On appeal, Lorenzen contends that the district court erred in excluding his expert testimony.  He maintains that the court imposed too stringent a causation standard and that, even under the standard applied by the court, he presented a reliable and relevant theory of causation that satisfies CRE 702.

¶ 5     Lorenzen also contends that the district court erred in entering judgment for Pinnacol, as he retained a claim for noneconomic damages that did not require expert testimony.

¶ 6     We reject his contentions and therefore affirm.

## I.     Background

### A.    Factual Background

---

[1] Pinnacol filed a "Motion to Dismiss Complaint Based on Rulings on Expert Testimony" but failed to cite the governing procedural rule or applicable standard of proof.  The district court construed the motion as a motion for summary judgment and reviewed it under C.R.C.P. 56, then entered an order granting the motion to dismiss.  Like the district court, we construe Pinnacol's motion as a motion for summary judgment, and we refer to the court's order as an order granting summary judgment in favor of Pinnacol.

¶ 7    On February 3, 2014, while Lorenzen was working as a groundskeeper for a country club, he injured his back and suffered a herniated disc with an extruded caudally migrated fragment.[2] Lorenzen's employer reported the injury to Pinnacol the next day.

¶ 8    Lorenzen was referred to Dr. Tracey Stefanon. She placed Lorenzen on work restriction, recommended over-the-counter anti-inflammatories, ordered an MRI, and referred Lorenzen to an orthopedic surgeon, Dr. Douglas Beard.

¶ 9    On February 6, Dr. Beard advised Lorenzen that he would likely need surgery, but, because Lorenzen wanted to avoid surgery if possible, Dr. Beard prescribed steroids with further monitoring. Lorenzen returned to Dr. Beard on February 10, still experiencing pain and foot weakness, and they decided that Lorenzen should have surgery as soon as possible.

¶ 10    Lorenzen spoke with a claims adjuster on February 12 and discovered that Dr. Beard had not submitted a request for

---

[2] According to the deposition testimony of Drs. Beard and Biggs, a caudally migrated disc extrusion occurs when the outer part of the spinal disc ruptures, causing the inner material to push "completely outside" of the disc. In Lorenzen's case, the material protruded downward, pressing on the nerve.

authorization of the surgery. He called Dr. Beard's office with a reminder to submit the request to Pinnacol, and Dr. Beard faxed a request to Pinnacol marked "urgent." According to Dr. Beard, an urgent request does not denote an emergency.

¶ 11    On February 17, Pinnacol verbally advised Lorenzen that it would not authorize surgery, and the next day, it formally denied his request on the ground that Lorenzen's injury was not work related.

¶ 12    On February 20, Lorenzen, now proceeding under his private health insurance, consulted with Dr. William Biggs, an orthopedic surgeon, and Dr. Biggs performed the surgery on February 25. After the surgery, Lorenzen continued to experience right foot weakness due to permanent nerve impairment.

¶ 13    On June 20, 2014, Pinnacol changed its position and determined that Lorenzen's injury was work related. It reimbursed him for his medical costs and paid other workers' compensation benefits.

## B.    Procedural History

¶ 14    Lorenzen filed this action against Pinnacol, asserting a claim for bad faith breach of an insurance contract. He alleged that "[a]s

a result of the delay in receipt of surgical intervention, Lorenzen has permanent weakness and loss of control over his foot with loss of strength and stability, which affects his work, his activities of daily living and his hobbies . . . ."

¶ 15    In support of his claim, Lorenzen disclosed four medical experts (Drs. Stefanon, Beard, and Biggs, and Dr. Rebeka Martin) who intended to opine that the delay in authorizing surgical intervention for Lorenzen resulted in his permanent nerve damage.

¶ 16    Pinnacol filed a pretrial motion to exclude the experts' testimony on the issue of medical causation, contending that their opinions were not scientifically reliable and were therefore inadmissible at trial.

¶ 17    The district court held a hearing on the motion at which it reviewed the deposition testimony and heard argument from counsel.  None of the doctors testified at the hearing.  Thereafter, the district court made detailed findings and issued an order disallowing the doctors from testifying at trial that the thirteen-day delay caused by Pinnacol resulted in Lorenzen's permanent impairment.

¶ 18    Pinnacol then moved for summary judgment, arguing that without the expert testimony, Lorenzen could not prove his bad faith claim. Lorenzen responded by filing a motion to reconsider the order prohibiting his experts' testimony. He attached to his motion additional ex parte "deposition" testimony of Dr. Beard and an affidavit by Dr. Martin. His motion for reconsideration continued to assert the theory that prompt surgical intervention is generally indicated for patients suffering from nerve compression, but it also raised a new theory of causation.[3]

¶ 19    The district court denied Lorenzen's motion for reconsideration, denied as moot Pinnacol's motion to strike the

---

[3] We will not address the arguments raised for the first time in Lorenzen's motion for reconsideration or consider the new evidence submitted with that motion. *See Fox v. Alfini*, 2018 CO 94, ¶ 37 (neither district court nor appellate court is obliged to consider new arguments and evidence submitted in motions to reconsider); *People v. Schaufele*, 2014 CO 43, ¶ 49 (Boatright, J., concurring in the judgment) ("Motions for reconsideration are designed to correct erroneous court rulings; they are not designed to allow parties to present new legal arguments for the first time and then appeal their denial to" an appellate court.); *McDonald v. Zions First Nat'l Bank, N.A.*, 2015 COA 29, ¶ 85 (in reviewing grant of summary judgment, appellate court will not consider arguments and evidence that were not presented to the trial court in connection with the motion for summary judgment).

doctors' new testimony, and granted Pinnacol's motion for summary judgment.

## II. Exclusion of Expert Evidence on Causation

¶ 20 Lorenzen argues that the district court applied an overly stringent but-for causation test rather than a more lenient "substantial factor" test. But in any event, he says, his expert evidence satisfies a but-for test and, therefore, the district court erred in excluding the experts' testimony. We disagree.

### A. The Applicable Standard of Causation

¶ 21 The issue of the correct standard of causation is a legal one. *Reigel v. SavaSeniorCare L.L.C.*, 292 P.3d 977, 985 (Colo. App. 2011). Therefore, our review of that issue is de novo. *Id.*

¶ 22 To prevail on a common law claim of bad faith breach of an insurance contract, the plaintiff must prove that the insurer acted unreasonably and that the insurer's unreasonable conduct caused the plaintiff's injury or damages. *See Bankr. Estate of Morris v. COPIC Ins. Co.*, 192 P.3d 519, 523 (Colo. App. 2008).

¶ 23 Damages for bad faith breach of an insurance contract are based on traditional tort principles. *City of Westminster v. Centric-Jones Constructors*, 100 P.3d 472, 484 (Colo. App. 2003). Under

7

traditional tort principles, the plaintiff must show that the defendant's conduct "proximately caused" the claimed injury. *Reigel*, 292 P.3d at 985; *see also June v. Union Carbide Corp.*, 577 F.3d 1234, 1238 (10th Cir. 2009) ("In Colorado, as elsewhere, a party seeking recovery in tort must demonstrate that the defendant's conduct caused the alleged injury.").

¶ 24    Proximate cause has two components: causation in fact and legal causation. *Moore v. W. Forge Corp.*, 192 P.3d 427, 436 (Colo. App. 2007). Legal causation — which refers to the scope or foreseeability of liability, *see June*, 577 F.3d at 1240 — is not at issue here; Lorenzen only challenges the test for causation in fact.

¶ 25    As to causation in fact, the test is "whether, but for the alleged [tortious conduct], the harm would not have occurred." *Reigel*, 292 P.3d at 985 (quoting *N. Colo. Med. Ctr., Inc. v. Comm. on Anticompetitive Conduct*, 914 P.2d 902, 908 (Colo. 1996)). Alternatively, the plaintiff can show factual causation by establishing that the defendant's conduct was a "necessary component of a causal set that would have caused the injury." *Id.* at 987; *see also* Restatement (Second) of Torts § 432(1), (2) (Am. Law Inst. 1965). Thus, Lorenzen had to present evidence that, but

8

for the thirteen-day delay between the request for authorization and the surgery, the permanent nerve damage would not have occurred, or that the delay was a necessary component of a causal set that would have caused his impairment.

¶ 26     Relying on *Sharp v. Kaiser Foundation Health Plan of Colorado*, 710 P.2d 1153 (Colo. App. 1985), *aff'd*, 741 P.2d 714 (Colo. 1987), Lorenzen argues that he could instead establish causation under the "substantial factor" test by showing that Pinnacol's conduct was a substantial factor in increasing the risk that he would have a less optimal surgical outcome.

¶ 27     In *Sharp*, the division held that the jury could decide causation where the plaintiff presented expert testimony that the defendants' conduct was a substantial factor in causing the injury in that it "substantially increased plaintiff's risk of the resulting harm or substantially diminished the chance of recovery." 710 P.2d at 1155. On review, the supreme court did not reach the issue of whether the substantial factor theory was a cognizable, less stringent standard of causation because the court concluded that the plaintiff had met her burden to show but-for causation. *Sharp*, 741 P.2d at 720.

¶ 28    However, as the Tenth Circuit explained in *June*, the "substantial factor" and but-for standards of causation are not alternatives; but-for causation is a prerequisite to establishing the substantial factor test.  577 F.3d at 1241.

¶ 29    In explaining the substantial factor test, section 432 of the Restatement (Second) of Torts, which the *Sharp* division did not consider, imposes a causation requirement at least as stringent as the but-for standard consistently applied by our supreme court:

> (1) Except as stated in Subsection (2), the actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent.
>
> (2) If two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about.

Thus, "the allegedly negligent conduct of the defendant must satisfy" a but-for test "before it can even qualify as a substantial factor under the other Restatement sections."  *Reigel*, 292 P.3d at 987.

10

¶ 30    Regardless of Lorenzen's theory of liability — that the thirteen-day delay between the request for authorization and the surgery caused his impairment or increased his risk of permanent impairment or aggravated a preexisting condition — he had to show that (1) but for the delay, the injury (or the increased risk or the aggravation) would not have occurred; or (2) the delay was a necessary component of a causal set that would have caused the injury.  *Id.*

### B.    The District Court Did Not Abuse Its Discretion in Excluding Lorenzen's Expert Testimony Concerning Causation

¶ 31    Lorenzen next contends that, even if he had to prove but-for causation, he presented expert evidence that the thirteen-day delay in performing surgery caused his permanent impairment, and the district court erred in excluding the evidence under CRE 702.

#### 1.    The Experts' Testimony

##### a.    Dr. Biggs

¶ 32    Dr. Biggs performed Lorenzen's surgery.  He testified at his deposition that five days of the two-week delay — from February 20, when he first saw Lorenzen, to February 25, when he performed the surgery — did not have "any detrimental effect [o]n the outcome."

¶ 33     When asked about his anticipated testimony concerning the

effect of the delay in surgery on Lorenzen's nerve damage, Dr. Biggs

testified:

> A: If you wait too long, you can end up with a permanent injury.  Now, the waiting too long part is always the question mark.  We don't have good data to tell us what's too long and what's not.
>
> . . . .
>
> Q: "[Your report says that you] will testify that it was not helpful to the patient to wait two weeks for surgery."  What will you say about that?
>
> A: That's a tough one.  You know, that's kind of the sooner the better sort of thing, but there's no proof in the literature about that.
>
> Q: "The wait from February 10, 2014, to February 25, 2014, was costly to the patient's nerve function."  What would your testimony be about that?
>
> A: It's maybe in hindsight we can say that he's had no nerve functional recovery or not much.  But it's hard to say that from – at the time of the injury.
>
> Q: It's also hard to attribute that to a two-week delay in surgery, isn't it?
>
> A: Yes.
>
> . . . .

12

Q: And also, in his specific case, can you really say that having surgery two weeks earlier would have resulted in a better outcome?

. . . .

A: For him specifically, no, we can't say that.

¶ 34 With respect to what he referred to as the "sooner is better" theory, Dr. Biggs recalled that he had seen articles that "supported doing surgery sooner rather than later with progressive neurologic injuries." However, he acknowledged that he did not know of any "good studies" to support the theory and that the "sooner is better" theory "may be more our dogma."

¶ 35 When asked if "Lorenzen's best chance of a recovery from this [injury] was early or shortly after his injury," Dr. Biggs replied, "I'm not sure I can answer that. . . . I don't know." He explained that "there's just no way of saying whether the nerve injury happened at the time of the injury or whether it happened during the first three weeks. The vast majority of people, if you leave the pressure on there for too long, it will continue to get worse and cause more of an issue." Dr. Biggs was asked whether that had "happen[ed] for Mr. Lorenzen?" He replied, "I don't know."

b. Dr. Stefanon

¶ 36    Dr. Stefanon was Lorenzen's initial treating doctor.  She testified that the majority of people with herniated discs "tend to recover without surgery," and that in most cases (even where patients showed symptoms similar to Lorenzen's), it was reasonable to monitor a patient for four to six weeks prior to performing surgery.

¶ 37    Dr. Stefanon opined that "the longer the pressure is on the nerve, the increased risk for damage to the nerve," but she agreed with Dr. Biggs that there is no "good data" on "what's too long and what is not."  She testified that surgery "sooner is better" in a "progressive situation," but she could not cite any peer-reviewed articles that would support that position.  She looked for articles about the timing of surgery — "when nerve root damage was likely to occur" or whether "there was a neurological level that generally people were sent to surgery" — but she "did not find anything."

¶ 38    Like Dr. Biggs, she could not say one way or the other whether a three-week delay in undergoing surgery would have had any adverse effect on the outcome.  When asked if she "believe[d] that some of the damage that Mr. Lorenzen currently faces could have

14

been headed off with a more timely surgery," she replied, "I would be speculating."

### c. Dr. Martin

¶ 39 Dr. Martin is a physiatrist who treated Lorenzen after his surgery. She testified that she had reviewed articles indicating that early surgical intervention was most helpful for "someone that has moderate weakness" after injury and that she would place Lorenzen in the "moderate" category. Thus, she opined that surgery performed sooner would have been better in Lorenzen's case.

¶ 40 At the same time, she agreed with Dr. Biggs that it was difficult to know whether the thirteen-day delay affected Lorenzen's surgical outcome because any conclusion would be based on the "sooner the better" theory for which "there is no proof in the literature." She also agreed that waiting too long for surgery could result in permanent nerve damage but that there was no good data to establish "what is too long and what is not."

¶ 41 When asked whether Lorenzen would be "better today if surgery had been performed earlier," she responded, "The hope would be that there would be more rapid and more complete myotomal recovery, so that he would have more strength." But she

15

acknowledged that any prediction in that respect was "just an assumption," and that she could not rule out that Lorenzen "would have had the same outcome if surgery had occurred earlier."

¶ 42    Dr. Martin summed up her causation theory in this way: "The best way to put it is time is nerve.  The longer you wait, the more potential nerve damage and changes that can occur."

### d.    Dr. Beard

¶ 43    Dr. Beard testified that Lorenzen's nerve impairment could have been caused by (1) the delay in surgery; (2) an injury during the surgical procedure; or (3) the original disc herniation on February 3, 2014.

¶ 44    He agreed with Dr. Biggs that the five-day delay in scheduling the surgery (between February 20 and 25, 2014) would not have had any adverse effect on its outcome, but, for reasons he did not explain, he theorized that the two-day delay in submitting the request for authorization (between February 10 and 12, 2014) might have resulted in increased nerve damage.

¶ 45    Dr. Beard stated that "had [Lorenzen] been able to receive surgical intervention in a more timely fashion, it is entirely possible that the earlier intervention might have led to less long-term

16

damage," though he admitted that it was also possible that the surgery "wouldn't have done any good at all," and that even if the surgery "had been performed on February 6, 2014," it was possible that Lorenzen "could have ended up with the same outcome as he has now."

¶ 46 According to Dr. Beard, "there is pretty good data out there" to support a "sooner is better" theory: "[T]here are many articles that talk about the shorter the duration of the palsy, the less likely there is to be permanent nerve deficit." On the basis of those articles, he believed that "if surgery had been performed sooner, it would have been better than surgery performed later." As he explained it:

> There are some things which kind of inherently, common sensibly seem to make sense. And I would postulate that most of the doctors that are involved in this case, if they walked into a doctor's office with as profound of a foot drop as Mr. Lorenzen had, they would want to have that piece of disc taken off their nerve root.
>
> It is a reasonable thing to do. Because it is nonanatomic. There was clearly a change in the anatomy. And by changing that anatomy faster, we make it more likely that the nerve can recover.
>
> Now, if you want to say what is that timing down to the day and the moment, I can't give it

to you. I would agree that there is going to be a substantial error rate there. But common sense would lead us to believe that the faster we reverse the abnormal anatomy, the more likely it is that the nerve can have a chance to recover.

Are there going to be those that aren't going to recover? Absolutely, I grant you that. Is Mr. Lorenzen one of those? We'll never know.

## 2. CRE 702

¶ 47 CRE 702 governs the admissibility of expert testimony. It provides as follows: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

¶ 48 To be admissible under Rule 702, scientific evidence, including medical evidence, must be both reliable and relevant. *People v. Ramirez*, 155 P.3d 371, 378 (Colo. 2007).

¶ 49 A trial court determines whether the testimony is reliable and relevant by considering whether (1) the scientific principles underlying the testimony are reasonably reliable; (2) the expert is qualified to opine on such matters; (3) the expert testimony will be

helpful to the jury; and (4) the evidence satisfies CRE 403. *Estate of Ford v. Eicher*, 250 P.3d 262, 266 (Colo. 2011).

¶ 50    The court's reliability inquiry should be broad in nature and consider the totality of the circumstances of the specific case. *Ramirez*, 155 P.3d at 378.  The standard for admissibility is reliability, not certainty.  *Estate of Ford*, 250 P.3d at 266.  Thus, the proponent need not prove that the expert is indisputably correct. *Ramirez*, 155 P.3d at 378.  Rather, reliability analysis under Rule 702 hinges on whether the scientific principles the expert employed are grounded in the methods and procedures of science.  *Estate of Ford*, 250 P.3d at 267.  If so, the testimony meets the reliability requirement.

¶ 51    A court may reject expert testimony that relies on bare assertions, subjective belief, or unsupported speculation.  *Id.*  The danger of speculative opinion testimony that has no sound scientific basis is that "what appears to be scientific testimony but is really not may carry more weight with the jury than it deserves." *Ramirez*, 155 P.3d at 379.

¶ 52    To determine relevancy under CRE 702, the court should consider whether the expert testimony would be useful to the fact

finder. *People v. Shreck,* 22 P.3d 68, 77 (Colo. 2001). Usefulness hinges on whether there is a logical relation between the proffered testimony and the factual issues involved in the case. *Ramirez,* 155 P.3d at 379. In determining whether the testimony will be helpful to the fact finder, the court should consider, among other things, the elements of the particular claim and the scope and content of the opinion itself. *Id.*

### 3. The District Court's Ruling and Standard of Review

¶ 53   The district court found that the "sooner is better" theory of causation was not "sufficiently grounded in reliable science," had "no prior history of adoption or consideration or approval by other courts," and had not been "subjected to sufficient peer review or study" to allow the court to assess the theory's reliability. Thus, the expert evidence would require the jury to "speculate as to whether and to what extent the delay . . . caused the current presentation by Mr. Lorenzen."

¶ 54   The district court concluded that the experts' testimony would not be helpful to the jury in evaluating whether the thirteen-day delay between Lorenzen's request for authorization of surgery and the surgery caused his impairment.

¶ 55    In civil cases, where the constitutional right to present a defense is not implicated, we review the district court's decision to exclude expert testimony for an abuse of discretion. *Core-Mark Midcontinent, Inc. v. Sonitrol Corp.*, 2012 COA 120, ¶ 29. We will not disturb the decision unless it is manifestly erroneous or based on an incorrect legal standard. *Id.* Even where a ruling excluding expert testimony is "outcome determinative" and the basis for a grant of summary judgment, our review is no less deferential. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142-43 (1997).

4.    The Experts' Theory of Causation Does Not Satisfy CRE 702's Reliability and Relevancy Requirements

¶ 56    Lorenzen summarizes his experts' theory of causation as follows: "Lorenzen's treating physicians all agree that when nerve compression lasts too long[,] it can result in permanent neurological injury[;] therefore surgery must be performed sooner rather than later." Thus, Lorenzen says, "[t]here is no basis to categorically reject as a matter of law, the indications for surgery, including the well-recognized principle in medicine that 'sooner is better than later' for treatment of acute disc herniations causing nerve compression."

21

¶ 57    But Lorenzen has to prove that the thirteen-day delay in his

case caused the "specific ailment of which [he] complain[s]"— nerve

damage resulting in permanent impairment to his right foot.  *June,*

577 F.3d at 1245-46.

¶ 58    As Dr. Beard explained, the "sooner is better than later" theory

amounts to a common sense and universal axiom that expedited

treatment is preferable to delayed treatment, particularly in cases

involving a disc herniation causing nerve compression.  That axiom

is undoubtedly sound, but it is not a *theory of causation.  See*

*McDowell v. Brown,* 392 F.3d 1283, 1299-1300 (11th Cir. 2004)

("[T]he notion of early treatment is well within common knowledge

that would be obvious to the average juror, but [it] has nothing to

do with causation.").  A general principle or axiom does not explain

the cause of an injury in a particular case.  *Id.* at 1300 ("[T]his 'the

earlier, the better' theory adds nothing absent some testimony

connecting the delay to the causation or aggravation of an injury.").

¶ 59    *Tomlinson v. Collins*, No. 2:09-cv-0125, 2010 WL 4317030

(S.D. Ohio Oct. 25, 2010) (unpublished report and

recommendation), *adopted*, 2011 WL 478835 (S.D. Ohio Feb. 7,

2011) (unpublished opinion), is instructive.  There, the plaintiff

injured his neck while he was an inmate in a state prison. Though he complained to various prison staff about his deteriorating condition, he did not receive treatment until his release, nearly seven months after the injury. By then, he was diagnosed with a displaced disc with compression and damage to the spinal cord. Surgery alleviated some of his symptoms but left him with numbness or pain in his hands, forearm, and neck. *Id.* at *1-3.

¶ 60     Plaintiff offered two medical experts to establish causation. The first doctor testified that he believed "that prolonged neural compression is more likely to result in permanent defect than had the patient been diagnosed and treated sooner." *Id.* at *6. The second doctor testified, similarly, that "the delay in surgery certainly could lead to residuals that may have been prevented by earlier surgical intervention." *Id.*

¶ 61     The defendants moved to strike the experts' testimony under Fed. R. Evid. 702, which is substantially similar to CRE 702. The district court granted the motion. Characterizing the experts' theories as a variation of "the earlier, the better" theory rejected in *McDowell*, the court explained that the problem with this theory is that it does not go to causation:

> The general proposition that prolonged neural compression is more likely to result in a permanent defect than had a patient been diagnosed and treated sooner says nothing about whether the delay in this specific plaintiff's diagnosis and treatment actually caused his residual symptoms, and that — not the more general relationship between delays in treatment and the presence of preventable residual injury — is what is at issue here. A jury would not be entitled to find on the basis of these opinions that the delay in treating [plaintiff's] medical condition actually caused him any harm.

*Id.* at *7.

¶ 62    We agree with *McDowell, Tomlinson,* and the other courts that have evaluated the theory[4] and have concluded that, on its own, a

---

[4] *See Estate of Anderson v. Strohman,* Civ. A. No. GLR-13-3167, 2016 WL 4013638, at *9 (D. Md. July 27, 2016) (excluding as unreliable the plaintiff's expert's theory of causation that "earlier treatment is preferable to later treatment"); *Dishman v. Wise,* Civ. A. No. 7:08-cv-45 (HL), 2009 WL 1938968, at *5 (M.D. Ga. July 7, 2009) (a "mere guess" that earlier treatment would have improved plaintiff's condition "simply fails the tests for expert opinion" (quoting *McDowell v. Brown,* 392 F.3d 1283, 1301 (11th Cir. 2004))); *Maudsley v. Pederson,* 676 N.W.2d 8, 14 (Minn. Ct. App. 2004) ("The conclusory statements that generally earlier treatment results in better outcomes" fail to explain "how and why" defendant's delay in treatment caused plaintiff's injury.).

Two cases cited by Lorenzen — *O'Neill v. Van Herpe,* 956 F.2d 263 (4th Cir. 1992) (per curiam) (unpublished table decision), and

principle that early treatment is preferable to later treatment is not a viable theory of causation.

¶ 63    That is not to say, as Lorenzen seems to suggest, that nothing short of expert testimony identifying the precise moment that Lorenzen's nerve damage became irreparable is sufficient under Rule 702. Instead, what is necessary is evidence that would allow a jury to find that, but for the delay, Lorenzen would not have suffered the impairment.

¶ 64    The line between impermissible speculation and reliable medical opinion is illustrated in *Bentley v. Highlands Hospital Corp.*, Civ. No. 15-97-ART, 2016 WL 7446910 (E.D. Ky. Dec. 27, 2016), on which Lorenzen primarily relies. The plaintiff in that case arrived at the emergency room with symptoms suggesting a serious problem with her spinal cord, but the emergency room doctor misdiagnosed

---

*Prosser v. Nagaldinne*, 927 F. Supp. 2d 708 (E.D. Mo. 2013) — do not address the reliability of the "sooner is better than later" theory. And, contrary to Lorenzen's argument, the special concurrence in *Adams v. Laboratory Corp. of America*, 760 F.3d 1322 (11th Cir. 2014) (per curiam), did not "back away from" *McDowell*, 392 F.3d 1283. *Adams* involved expert testimony on the standard of care, not on causation, and the concurrence cited *McDowell* with approval.

her and discharged her. *Id.* at *1. Her condition worsened, and by the time she arrived at a second hospital later the next day, she had lost motor control in both legs and was having trouble breathing. *Id.* After discovering inflammation on the plaintiff's spinal cord, doctors at the second hospital treated her with intravenous steroids, which stopped the symptoms from progressing but did not reverse the loss of motor control. The plaintiff suffered permanent paralysis from the chest down. *Id.*

¶ 65 She sued the first hospital and the emergency room doctor for negligently failing to diagnose and treat her emerging neurological condition. *Id.* at *2. Her experts, two doctors, opined that earlier administration of steroids could have prevented her paralysis. *Id.* The defendants moved to exclude the testimony as too speculative because, while administration of intravenous steroids was indisputably the proper treatment, there was no evidence, they said, that the injury would have been avoided if the drugs had been administered earlier. *Id.* at *4.

¶ 66 The district court distinguished the proposed expert testimony from the "generic medical testimony that 'earlier treatment is better'" that has been routinely rejected by courts. *Id.* at *9. The

26

district court acknowledged that evidence of the anti-inflammatory properties of steroids would have been insufficient to justify the doctors' conclusions that steroids would have helped the plaintiff. *Id.* at *7. But the district court concluded that the doctors could testify more precisely — based on reliable medical principles, scientific literature, and their clinical experiences — that (1) if a patient has motor control or sensory function, the corresponding nerves have not yet been fully destroyed and there is more function left to preserve; (2) patients treated with intravenous steroids while they still have motor control and/or sensation overwhelmingly have good or fair outcomes; (3) they examined the plaintiff and her medical records and observed that she still had motor control and sensation in her lower extremities when she left the first hospital; and (4) the record demonstrated that intravenous steroids did help the plaintiff, but they came too late to save much of her neurological function. *Id.* at *6-7.

¶ 67 As the court explained in *Bentley*, the doctors started with the general premise that steroids combat inflammation and they connected that premise to a conclusion through a series of principles and inferences based on their medical knowledge

27

(informed by the scientific literature), their clinical experiences, and their review of the medical records. They observed that the plaintiff had inflammation to her spinal cord; inflammation damages nerve tissue; steroids counteract the inflammatory process by inhibiting the production of white blood cells; if introduced early enough, steroids can accomplish that task before the immune system pushes the nerve cells beyond the point of repair; and "early enough" means while the patient still has motor control or sensory function, an indication the patient's nerves are not yet destroyed. The doctors observed that the plaintiff still had motor control or sensory function when she left the first hospital, as evidenced by her ability to walk, and, therefore, the introduction of intravenous steroids at the first hospital would more likely than not have minimized the plaintiff's paralysis. Based on these facts, the district court in *Bentley* ruled that the doctors had "good grounds" for reaching their conclusion regarding causation. *Id.* at *9.

¶ 68 In contrast, Lorenzen's expert testimony left significant gaps between his premise that nerve compression should be alleviated by prompt surgery and his conclusion that it is more likely than not the thirteen-day delay in undergoing surgery caused his permanent

28

nerve damage. Unlike the doctors in *Bentley*, Lorenzen's experts did not have "good grounds" to opine, with a reasonable degree of certainty, that surgery at any point before February 25, 2014, would have been "early enough" to prevent or minimize Lorenzen's impairment.

¶ 69     Dr. Biggs, the surgeon, admitted that "there's no way of knowing if [Lorenzen's] permanent nerve injury happened at the time of his injury or it happened at day 2 or day 6 or day 12 or day whatever it was, 14, 16, 18." Thus, he could not say when surgery would have been "early enough" to make any difference at all, and neither could any of the other doctors.

¶ 70     Testimony does not assist the trier of fact unless there is a "justified scientific relationship" (a "fit") between the opinion testimony and the facts of the case. *McDowell*, 392 F.3d at 1299. There is no "fit" where "a large analytical leap must be made between the facts and the opinion." *Id.*

¶ 71     The cited medical literature proffered by Lorenzen did not fill in the analytical gaps. The district court found that the proffered articles were "not factually consistent with the issues in this case"

and did not support a conclusion that a thirteen-day delay in undergoing surgery was likely to cause irreparable nerve damage.

¶ 72 Lorenzen directs us to two of the articles representative of those submitted to the district court: a 2014 article discussing the results of a study comparing surgical versus nonsurgical treatment for lumbar disc herniation (the SPORT study), Jon D. Lurie et al., *Surgical Versus Nonoperative Treatment for Lumbar Disc Herniation*, 39 SPINE 3 (2014), and a 2002 article discussing the results of a study comparing recovery outcomes of patients who underwent surgery somewhere between a few weeks and several months after the initial injury (the Postacchini article), Franco Postacchini et al., *Rediscovery of Motor Deficits After Microdiscectomy for Lumbar Disc Herniation*, 84-B J. Bone & Joint Surgery 1040 (2002).

¶ 73 The SPORT study does not support any theory of causation relevant to this case. That patients who undergo surgery do better than those who receive nonsurgical treatment is not probative because Lorenzen underwent surgery.

¶ 74 The Postacchini article is more on point. Of the patients in that study who exhibited severe deficits before surgery, those who underwent surgery most quickly — within one month of the initial

injury — had a complete recovery, whereas most patients who underwent surgery after seventy days from the date of injury had an incomplete recovery of muscle strength. But Lorenzen underwent surgery within a month of his initial injury, so, according to the study, the timing of his surgery should have helped him. What Lorenzen needed to support his theory of causation was a study or article showing that surgery performed *earlier* than his surgery led to better outcomes in some group of patients. But he did not submit any such study.

¶ 75    We therefore discern no abuse of discretion in the district court's determination that the cited articles did not render the experts' testimony reliable.

¶ 76    In sum, we conclude that the district court did not abuse its discretion in disallowing the experts' testimony because it would not have assisted the jury in determining whether Pinnacol's delay in authorizing surgery caused Lorenzen's permanent impairment.

### III.    Entry of Judgment for Pinnacol

¶ 77    Lorenzen concedes that, without his expert testimony, he cannot prove that Pinnacol's delay in approving surgery caused his physical impairment or damages related to the impairment. Still,

he contends that the district court erred in entering judgment for Pinnacol because he retained a separate claim for noneconomic damages based on the anxiety, stress, and inconvenience associated with Pinnacol's initial denial of benefits.

¶ 78 Pinnacol argues that Lorenzen pleaded a single claim for damages based on Pinnacol's bad faith delay in authorizing surgery, and that the complaint did not provide notice of any other claim for noneconomic damages.

¶ 79 Although the district court did not address this issue, whether Lorenzen pleaded a claim for noneconomic damages unrelated to his physical injury is a question of law that we review de novo. *See Eliminator, Inc. v. 4700 Holly Corp.*, 681 P.2d 536, 539 (Colo. App. 1984). Thus, a remand is unnecessary.

¶ 80 The purpose of a complaint is to provide the defendant with "reasonable notice of the general nature of the matter presented." *DiChellis v. Peterson Chiropractic Clinic*, 630 P.2d 103, 105 (Colo. App. 1981). If the complaint identifies the transaction that forms the basis of the plaintiff's claim, it provides reasonable notice. *Denny Constr., Inc. v. City & Cty. of Denver*, 170 P.3d 733, 736 (Colo. App. 2007), *rev'd on other grounds,* 199 P.3d 742 (Colo.

2009).  However, while the complaint need not list all examples of defendant's misconduct, it must at least give the defendant sufficient notice of the basis of the claim so that the defendant can use the discovery rules to prevent any surprise at trial.  *See Southerland v. Argonaut Ins. Co.*, 794 P.2d 1102, 1105-06 (Colo. App. 1990).

¶ 81  Here, even construing Lorenzen's complaint liberally and resolving all doubts in his favor, we cannot conclude that it contained a claim for noneconomic injuries unrelated to the physical impairment.  *Denny Constr.*, 170 P.3d at 736.

¶ 82  The complaint alleged that, "[a]s a result of the delay in receipt of surgical intervention, Lorenzen has permanent weakness and loss of control over his foot with loss of strength and stability, which affects his work, his activities of daily living and his hobbies, including motorcycle trips with his wife and friends."  Lorenzen identified his "damages and losses" as "permanent physical impairment; disfigurement; unnecessary pain and suffering and emotional distress; unnecessary financial hardship; and the possibility of future economic losses" based on possible unemployment.  The complaint did not allege that Lorenzen

suffered stress, anxiety, or distress for some reason other than his physical impairment, including the uncertainty of reimbursement of benefits.

¶ 83     Nor did Lorenzen disclose any independent claim for noneconomic damages during discovery.  At his deposition, Lorenzen explained that he had been injured by the denial of his claim in that "it put off the surgery.  It put off any recovery [he] had."  He testified that Pinnacol's handling of the claim was "wrong" and left him "very frustrat[ed]" and "angry."

¶ 84     Lorenzen intended to introduce evidence concerning the impact of his physical impairment on "the daily activities of life, including work and leisure activities."  Lorenzen's wife submitted a statement discussing Lorenzen's physical and emotional changes since his injury.  She reported that he was unable to enjoy their walks, hikes, and runs; he stumbled frequently, even on flat ground; and his impairment made him angry, frustrated, and depressed.

¶ 85     We conclude that Lorenzen pleaded a single claim for economic and noneconomic damages based on his physical impairment.  And because he cannot prove that Pinnacol's conduct

34

caused his physical impairment, it follows that he also cannot prove that Pinnacol is responsible for the noneconomic damages resulting from his physical impairment.

¶ 86　　Accordingly, we discern no error in the court's dismissal of Lorenzen's complaint and entry of judgment for Pinnacol.

### IV.　Lorenzen's Additional Contentions

¶ 87　　In light of our disposition, we need not address Lorenzen's challenges to the district court's discovery ruling and its order imposing costs.

### V.　Conclusion

¶ 88　　The judgment is affirmed.

JUDGE TAUBMAN and JUDGE ROTHENBERG concur.